THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee; *v.* STEVEN BROOKS GAINES, Defendant-Appellant.

(Nos. 57843, 58985 cons.;

First District (3rd Division)—August 1, 1974.

Edward M. Genson, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Kenneth L. Gillis and Dennis O'Hara, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE DEMPSEY delivered the opinion of the court:

■■ The defendant, Steven Gaines, was charged with the offense of deviate sexual assault. He withdrew his plea of not guilty, entered a plea of guilty and was sentenced to imprisonment for a term of 4 to 6 years at the Illinois State Penitentiary at Menard. This is a consolidated appeal from the judgment rendered on his guilty plea and from the dismissal of his petition for post-conviction relief. The two phases of the appeal have been commingled in his argument and brief. The legal issues pertaining to each phase are different, and we will consider them separately. *People v. McCarroll* (1973), 10 Ill.App.3d 249, 294 N.E.2d 52.

Gaines contends that: (1) his prosecution as an adult was based on a sex classification and thus violated his right to equal protection under the law; (2) his guilty plea was neither intelligently nor voluntarily made; (3) his sentence was influenced by the court's considering improper testimony concerning previous criminal behavior for which he had been arrested but not convicted; (4) his sentence was excessive because the court misapprehended the permissible punishments and, (5) his post-conviction hearing was unfair because the judge who presided at his trial conducted the hearing.

When Gaines' case was called for trial, his counsel requested a conference with the assistant State's Attorney and the judge. Gaines' approval of the request appears of record. After the court reconvened, the People read into the record a short narrative of the facts of the case. Gaines, through his counsel, stipulated to those facts. The court then explained the charge of deviate sexual assault and the punishment that could be imposed upon him: imprisonment from 4 to 14 years. Gaines acknowledged his understanding of the charge and of the potential punishment. There followed an explanation by the court of the defendant's rights and the consequences of their waiver, and an inquiry into the voluntariness of the plea. Gaines at that point hesitated, saying that the plea was not a result of his own decision, but rather "my attorney's and my mother's and my father's." He was then questioned, first by counsel and then by the court:

"Counsel: Mr. Gaines, your mother and I have had a discussion a few moments ago in the jury room of this courtroom?

Gaines: Did we?

Counsel: Yes.

Gaines: Yes.

Counsel: Did we discuss the possibilities of entering pleas and not entering pleas?

Gaines: Yes.

Counsel: And was it your decision with our conversation that a plea of guilty should be entered?

Gaines: No.

Counsel: It is your wish not to enter a plea of guilty?

Gaines: No.

Counsel: You do not wish to enter a plea of guilty?

Gaines: No.

Counsel: You wish to enter a plea of not guilty?

Gaines: No.

Counsel: What is your desire, Mr. Gaines?

Gaines: When you asked me if I was guilty, I could honestly say I don't know, so. * * *

Counsel: Is it your desire to have a plea of not guilty entered before this court, or a plea of guilty?

Gaines: A plea of guilty because of the circumstances that we talked about.

The Court: The question I am asking you, Mr. Gaines, is whether you are doing this voluntarily? Are you making the decision?

Gaines: Okay, I am, yes."

Gaines twice repeated that the plea was his own and was made voluntarily. After he had executed a written jury waiver, the court inquired whether his plea had been induced by promises, threats or coercion from any person. He replied twice that it had not and acknowledged that if any promises had been made, they would not bind the court. Before the colloquy ended, Gaines again affirmed his plea of guilty:

"The Court: Now, Mr. Gaines, knowing the nature of the charge against you, the consequences thereof, and the penalty that may be imposed upon you; knowing of your rights that you have just waived, do you still desire to enter a plea of guilty to the crime of deviate sexual assault?

Gaines: Yes."

At the hearing in aggravation and mitigation a number of witnesses testified to the circumstances of the assault. The victim stated that on July 13, 1971, as she and two female companions were leaving a tavern on Chicago's southwest side, Gaines forced his way into their auto and committed a deviate sexual assault upon her. She related that he held a knife at her side and threatened to kill her if she did not perform the acts which he commanded. He also threatened her companions, instructing one of them to drive the car and ordering the other to disrobe. The latter woman, who had been riding alone in the auto's back seat, corroborated the victim's story. She added that her signals of alarm drew the attention of a group of men who had left the tavern at the same time as the three women. The men followed the auto until it stopped at an intersection. They then left their own car and ran to the women's aid; one of them dragged Gaines into the street. Gaines got loose and ran away, but was apprehended shortly afterward. The man who had pulled Gaines from the auto testified and identified him as the man who had been in the women's car.

The prosecution called two additional witnesses. The first was a young woman who, over objection by defense counsel, described an attempted deviate sexual assault on herself by Gaines in October 1970. In many ways Gaines' behavior at this earlier incident paralleled his conduct at the later one. However, the earlier victim had screamed, which frightened Gaines away. A police officer testified that he had arrested Gaines moments after the October attack and had shown him to the previous witness, who positively identified him as her assailant. The record does not disclose whether Gaines was convicted for this offense.

Also received in evidence was a psychologist's report. The report stated that Gaines, although possessing average to above-average intelligence, displayed "a combination of syndromes often found in hospitals for the

mentally disturbed," and recommended a long-term psychiatric supervision and counseling. A letter from Dr. Littner of the Institute of Psychoanalysis, said of the defendant:

> "It was my impression, both from his history as well as from my examination, that his emotional illness was of such a degree and nature that he could be considered potentially dangerous to others —particularly if his emotional condition should worsen.
>
> He seemed fully aware of the nature of the charges against him; he seemed perfectly capable of cooperating with his counsel; and he seemed quite capable of distinguishing right from wrong."

Dr. Tilkin testified for the defendant that he had treated him since his arrest in July of 1971. He concurred with the psychologist's report and with the opinion of Dr. Littner that the defendant required a long period of treatment for his emotional problems. However, he could not predict whether Gaines would or would not commit this type of offense again. He limited his assurances to a statement that among his patients 7 of 10 responded well to treatment. The defendant's father testified that he had previously sought psychiatric help for him in 1969, "when my son got in his first trouble," and in 1970, first "to try to find help for Steven with the dope situation," and then after his arrest for the October assault.

The court stated that it was impressed with Gaines' chances for rehabilitation, but noted that he had obtained drugs while hospitalized under Dr. Tilkin's care. The court concluded that incarceration could not be avoided:

> "* * * You have weaknesses. If you were just going to destroy yourself I would take the chance and let you destroy yourself or straighten yourself out. My responsibility is not only to you but to the other members of society.
>
> The odds of seven to three just aren't good enough."

Promising to seek assurances that Gaines would receive psychiatric care and expressing his willingness to "personally go to bat" for him before the parole board when he had shown satisfactory progress, the court sentenced him to 4 to 6 years in the Menard penitentiary.

■■ Gaines, who was 17 years of age at the time of the 1971 offense, claims that his prosecution as an adult denied him the equal protection of the law, because a female of the same age would have been prosecuted under the Juvenile Court Act as it was then written. (Ill. Rev. Stat. 1969, ch. 37, par. 702—7(1).) This issue has been settled in *People v. Ellis* (1974), 57 Ill.2d 127, 311 N.E.2d 98. It was held that the differential classification according to sex was invalid, but that the effect of its invalidity was to render the provisions of the Juvenile Court Act inapplicable to both males and females who were not under the age of

17 years at the time they committed an offense. Therefore, the failure to consider Gaines eligible for treatment as a minor did not deprive him of equal protection of the law.

Nor do we agree that Gaines' plea of guilty was secured in violation of his constitutional right to due process. He alleges involuntariness because of the improper influence of his parents, counsel, and the court, and also that the plea was not made understandingly, due to his youth and emotional instability.

No evidence appears of record to support the allegation that the defendant was subject to any pressure by the court in his decision to enter a guilty plea. Therefore, we address ourselves only to the alleged pressure exerted by his parents and his attorney.

Constitutional guarantees of due process require that a plea of guilty be intelligent and voluntary. If the plea is to withstand appellate review, the record must affirmatively disclose that the defendant who pleads guilty enters his plea understandingly and voluntarily. (*Boykin v. Alabama* (1969), 395 U.S. 238, 23 L.Ed.2d 274, 895 S.Ct. 1709; *People v. Reeves* (1971), 50 Ill.2d 28, 276 N.E.2d 318.) The fact that other persons have advised a defendant to plead guilty does not render the plea invalid. (*North Carolina v. Alford* (1970), 400 U.S. 25, 27 L.Ed.2d 162, 91 S.Ct. 160.) The defendant points to *United States ex rel. Brown v. LaVallee* (S.D.N.Y. 1969), 301 F. Supp. 1245, where the court held that a guilty plea which was induced by a defendant's will being overborne by the persistent and unrelenting advice of counsel and the "hysterical pleadings of an overwrought mother" (301 F. Supp. at 1253) did not reflect the defendant's own considered choice and therefore was involuntary. But in the *Brown* case there was substantial evidence in the record to show coercion at the arraignment. Here, all that appears is the defendant's initial indecision or hesitation, his questioning by his counsel and then the judge, and a final settling on a plea of guilty, which he then reaffirmed as his own choice three times. As regards the influence of his parents—if they advised him to plead guilty it was done privately; the record reflects only their presence when the plea was entered; they made no comment.

■■ Concerning the intelligence with which the defendant entered his plea and his competence to plead, it is appropriate to note that it is not within the province of an appellate court to determine whether a defendant has made the best choice when entering a guilty plea. It is sufficient that the record shows he was aware of the alternatives presented to him and their consequences. (*North Carolina v. Alford.*) The record adequately demonstrates that Gaines was fully aware of the consequences of his plea. But he claims that he was incompetent to plead by reason of his youth and emotional instability. He also claims an inability to re-

member the events for which he was charged, and ascribes this to the effects of his prolonged use of drugs.

■■■ The defendant has confused the question of capacity to understand the nature of his acts at the time of his offense with the question of his competency to stand trial. If a defendant understands the nature and object of the charge against him and can, in cooperation with his counsel, conduct his defense in a rational and reasonable manner, then he is competent to stand trial. The presence of a mental disturbance or defect is not alone sufficient to conclude the issue of competence. (*Withers v. People* (1961), 23 Ill.2d 131, 177 N.E.2d 203.) Youth does not indicate incompetence, as long as a defendant is not below the minimum age fixed by statute for criminal capacity. (*People v. Davis* (1947), 396 Ill. 432, 72 N.E.2d 193, *cert. denied*, 332 U.S. 848.) Further, there was no previous adjudication of mental incompetence, no request for a sanity hearing by the defendant or his counsel, and no facts presented which should have raised in the court's mind a bona fide doubt of the defendant's mental competence. (See *People v. Cleggett* (1961), 22 Ill.2d 471; 177 N.E.2d 187.) The defendant's statements to the court were coherent and lucid. The psychologist's report, tendered at the presentencing hearing, said he was of average or better intelligence. Dr. Littner found Gaines capable of distinguishing right from wrong and able to cooperate with counsel in the preparation of his defense. Gaines' psychiatrist concurred in these opinions. Such an agreement by two or more medical experts justifies a finding of competency to answer charges. *People v. Lyons* (1969), 42 Ill.2d 437, 250 N.E.2d 133.

■■ The record affirmatively discloses that Gaines was competent to make his own decision to plead guilty and that he made it understandingly and without compulsion.

■■■ As a general rule, prior arrests not followed by conviction are not admissible during a hearing in aggravation and mitigation. (*People v. Riley* (1941), 376 Ill. 364, 33 N.E.2d 872.) The major justification for the rule is the fear a defendant may be subjected to punishment for crimes of which he is not guilty. But the interest in protecting a defendant's rights must to a limited extent be weighed against other concerns. Obligations are due the public as well as the accused. Modern concepts of justice, social theory and law admonish that courts should mete out sentences tailored as well as possible to fit the individual offender's circumstances, striking a balance between the protection of the public and the rehabilitation of the offender. (*People v. Williams* (1972), 7 Ill.App.3d 733, 288 N.E.2d 636.) Proper performance of this task demands the broadest possible familiarity with the individual offender's circumstances. So, in aggravation and mitigation hearings, the court is charged

to look at the facts of the crime, and search anywhere within reasonable bounds for other facts which tend to aggravate or mitigate the offense. Acceptable areas of inquiry include the moral character of the offender, his mentality, his habits, his social environments, his abnormal or subnormal tendencies, his age, his natural inclination or aversion to commit crime, the stimuli which motivate his conduct, and something of his life, family, occupation and criminal record. (*People v. McWilliams* (1932), 348 Ill. 333, 180 N.E. 832; *People v. Mann* (1963), 27 Ill.2d 135, 188 N.E.2d 665.) When making such inquiry, the formal rules of evidence do not apply. It is enough that the court "exercise care to insure the accuracy of information considered and to shield itself from what might be the prejudicial effect of improper materials." *People v. Adkins* (1968), 41 Ill.2d 297, 300, 242 N.E.2d 258.

■■ Highly relevant matter should not be excluded from a sentencing hearing merely because a narrative of the defendant's past activity mentions an arrest which followed that activity. The unvaried application of the prior-arrest exclusionary rule would deny courts access to valuable information where, as here, a previous arrest is only incidental to testimony that the defendant has behaved in a similar, aberrant fashion in the non-distant past. It would ignore the fact that even at trial evidence may be admissible for one limited purpose although inadmissible for another. If a jury of laymen can distinguish between the acceptable and unacceptable uses of certain evidence, for the purpose of ascertaining guilt, as the law assumes it can, then a court of review should recognize a like capacity in trial judges when assessing evidence at the less crucial stage of the presentence hearing.

The evidence of Gaines' prior behavior was relevant to the court's determination of his potential for rehabilitation, and the dangers he might pose to society if not incarcerated. Evidence of recidivism was extremely important to an assessment of both concerns. Moreover, the evidence did not present the same trampling on the accused's protections as might be the case if it were not pertinent to appropriate sentencing; or where the arrest and the attendant behavior took place many years ago; or where the arrest was for an offense wholly dissimilar to the one for which the accused is facing sentence (*cf. People v. Riley*); or where the court has been informed of the bare fact of an arrest, with no indication at all of its relevancy. In addition to its relevancy, the information in this case came from trustworthy sources: direct testimony by the victim and the arresting officer. It was received in open court, and the opportunity was afforded the defendant's counsel to cross-examine the witnesses and the defendant to deny the testimony. This he did not do. (*Cf. Taylor v. United States* (9th Cir. 1950), 179 F.2d 640, *cert. denied*, 339

U.S. 988.) In these respects this case is dissimilar from some relied upon by the defendant, in which sentences were based in part on assumptions of past criminality that were materially untrue or were related through sources traditionally held to be unreliable, such as hearsay. See *United States v. Tucker* (1972), 404 U.S. 443, 30 L.Ed.2d 592, 92 S.Ct. 589.

Whether the court allowed itself to be prejudiced by the arrest can be judged by viewing the case as a whole and its disposition. In the first place a court is presumed to have sorted the competent aspects of testimony from the incompetent. (*People v. Bey* (1972), 51 Ill.2d 262, 281 N.E.2d 638.) In the second place, the court was not likely to be misled as to the importance of the arrest itself, since the court received a factual description of defendant's behavior which was so similar to that for which he had pleaded guilty. Third, the mention of arrest was to some extent cumulative to that which other witnesses, appearing in behalf of the defendant, hinted at. There was testimony from Gaines' father and mention in the psychologist's report that the defendant had some prior history of similar conduct which resulted in a brush with the law. Finally, the sentence itself is the best possible evidence that the court was not influenced by the evidence of arrest. The maximum sentence imposed was 6 years, just 2 years above the statutory minimum. Moreover, the court offered to take personal interest in the defendant's progress.

■■■ Judgments will be upheld unless there is a "definitive indication" that the court considered arrests not resulting in conviction. (*People v. West* (1972), 3 Ill.App.3d 963, 279 N.E.2d 503. And see *People v. Dixon* (1971), 2 Ill.App.3d 279, 276 N.E.2d 42.) As this court stated in *People v. Wilson* (1973), 11 Ill.App.3d 693, 696, 297 N.E.2d 277:

> "[T]he mere fact that a trial judge, before imposing sentence, is aware of certain inadmissible facts does not automatically insure a reversal of that sentence. The function of a reviewing court is not to determine whether the record is perfect, but to determine whether defendant had a fair trial. Where it can be said from the record that an error complained of could not reasonably have affected the result of the trial, the judgment of the trial court will be affirmed."

The evidence of the defendant's previous arrest not followed by conviction, while incompetent, was not prejudicial.

The defendant next maintains that his sentence of 4 to 6 years in the penitentiary was arbitrary, because the court misapprehended the availability of probation. He argues that because the court did not consider probation a permissible sentencing option under the statute, it miscon-

ceived the range of available dispositions. To correct the alleged error he seeks remand for a reconsideration and resentencing.

If the court clearly did not understand the punishments, including probation, which were available for the offense, that fact might have resulted in discriminatory sentencing which would necessitate remandment. (See *People v. Hunt* (1972), 3 Ill.App.3d 1074, 280 N.E.2d 46.) Or, if the record was inadequate to permit an informed judgment whether the court considered the full range of permissible dispositions, then given the allegations of the defendant's petition, fundamental fairness might compel the return of the cause to the trial court for redetermination. (*People v. Smice* (1967), 79 Ill.App.2d 348, 223 N.E.2d 548.) But neither of those situations is presented in the facts of this case. The record reveals no factual basis for a contention that the sentence imposed was arbitrary or excessive.

The transcript of the presentencing hearing amply demonstrates the court's awareness that deviate sexual assault was a probationable offense. During that proceeding the State's Attorney argued against a grant of probation, and the court acknowledged the alternative. It expressed discontent with a statute which forced it to choose between permitting the defendant to roam at large or sentencing him to serve at least 4 years in the penitentiary. In settling on the latter alternative, the court noted the psychiatrist's opinion that chances were 3 in 10 that the defendant might not respond well to continued treatment.

The only indication of any misapprehension concerning the permissible range of sentences is found in the transcript of the arguments heard on the defendant's petition for post-conviction relief.

Only a portion of the petition is included in the unindexed excerpts of the record furnished by the defendant's counsel. The assertions in the petition were identical to some of the trial errors raised in the direct appeal: transgression of the defendant's rights, as a 17-year-old male, to equal protection of the law; acceptance of an involuntary plea of guilty; consideration of his prior criminal behavior without proof that the behavior had been followed by a conviction, and the imposition of an excessive sentence. In commentng on the latter assertion, the court noted that there had been no negotiated plea and that an extensive hearing had been held before the sentence was pronounced. At one point the court said that the defendant's offense was not probationable, but was quickly corrected by the defendant's attorney and the prosecutor. This—which was nothing more than a temporary lapse of recollection—is the basis for the contention that the court misunderstood the range of sentences applicable to the defendant's offense and arbitrarily sentenced him to prison.

The trial court record shows that the court considered but rejected the possibility of probation. The petition alleged no facts outside the record to support the assertions of duress, capacity or excessive punishment, and the facts in the record are simply incapable of justifying a post-conviction hearing on these issues or on the purported misunderstanding and arbitrariness of the court.

■■ The only assertion in the petition of something outside the trial record was that the defendant had an insanity defense, but was informed by his trial counsel that the defense "was not proper and legally unsound, which judgment was error." This allegation was unsupported by the affidavit of the defendant or by other proof, and there was no claim that the failure to use the insanity defense indicated inadequate representation. All the other allegations could be resolved by examining the trial record and the court correctly concluded that an evidentiary hearing on the post-conviction petition was unnecessary. *People v. Ramme* (1972), 4 Ill.App.3d 386, 280 N.E.2d 473. The defendant's final contention is that the court should have disqualified itself from presiding at the post-conviction hearing. The petition did not request a change of venue and no complaint was made concerning venue until the court, in sustaining the State's motion to dismiss, summarized its findings and reviewed the circumstances of the guilty plea.

■■ The right to a change of venue in a post-conviction proceeding is not absolute. An exception is made if it appears that the court may be biased or may be a potential witness. (*People v. Wilson* (1967), 37 Ill.2d 617, 230 N.E.2d 194.) However, where a defendant does not allege inducement to plead guilty by some action of the trial judge, and does not request a change of venue in his petition, the court's failure to disqualify itself is not an abuse of discretion. (*People v. Hayes* (1971), 49 Ill.2d 298, 273 N.E.2d 838.) Here the defendant's petition did neither.

■■ The court was not a potential witness. The record itself completely refuted the defendant's allegations. A court may properly render its decision on a motion to dismiss based upon the contents of the petition to which the motion is directed, read in conjunction with the transcript of proceedings at the trial. (*People v. Slicker* (1969), 42 Ill.2d 307, 247 N.E.2d 407; *People v. Hamby* (1968), 39 Ill.2d 290, 235 N.E.2d 572.) The court acted well within the bounds of its authority. Although expressed in terms of personal recollection, its summary of the circumstances surrounding entry of the guilty plea merely confirmed that which is plain on the face of the record. When ruling, the court relied on the written record. After stating its recollection, the court added this disclaimer: "Be that as it may the record speaks for itself as far as that is

concerned." The court did not err in refusing to disqualify itself from presiding at the post-conviction proceeding.

The judgment entered on the defendant's plea of guilty and the dismissal of his petition for post-conviction relief are affirmed.

Affirmed.

McNAMARA, P. J., and MEJDA, J., concur.