THE PEOPLE OF THE STATE OF ILLINOIS, Respondent-Appellee, *v.* BRUCE ALAN DAVIS, Petitioner-Appellant.

First District (2nd Division)    No. 77-1553

Opinion filed October 24, 1978.—Rehearing denied November 21, 1978.

Ralph Ruebner and Patricia Unsinn, both of State Appellate Defender's Office, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Lee T. Hettinger, Mary Ann Callum, and Stephen D. Ferrone, Assistant State's Attorneys, of counsel), for the People.

Mr. PRESIDING JUSTICE STAMOS delivered the opinion of the court:

This appeal arises from the dismissal, by the Circuit Court of Cook County, of appellant's petition for post-conviction relief. The petition essentially alleged that there was a bona fide doubt as to petitioner's competency to withdraw a plea of not guilty and enter a guilty plea.

In November of 1971, petitioner was arrested in San Francisco, California, on charges of murder and robbery lodged against him in the District of Columbia. Later that month, an Illinois warrant was lodged against him for the murder and robbery of Charles Barlassina in Chicago, Illinois. In September of 1972, following his plea of guilty to reduced Federal charges of manslaughter and robbery, petitioner was sentenced to 5 to 15 years. He began serving his sentence in the District of Columbia jail, but was soon transferred to the Federal penitentiary at Terre Haute, Indiana. Subsequently, on November 28, 1972, he was transported to Chicago, where he entered a plea of not guilty to the Illinois charges pending against him.

On December 18, 1972, change of plea proceedings were commenced in the Circuit Court of Cook County, in which petitioner sought to withdraw his plea of not guilty and enter a plea of guilty to the murder and robbery charges. Petitioner was represented by the public defender.

At the outset of the change of plea proceedings, petitioner declared that he intended to withdraw his earlier plea in order to enter a plea of guilty. After being warned of his right to remain silent, petitioner was informed of the charges against him. He was then asked if he understood the charges and if he knew that his change of plea was equivalent to admitting the charges. He replied that he understood.

The State and petitioner, through the public defender, then entered into a series of stipulations. These stipulations were as follows:

(1) Sam Burke, security agent for the Sherman House Hotel, where the murder and robbery took place, would have testified that he saw petitioner in the lobby of the hotel on June 28, 1971.

(2) Michael Kress, assistant State's Attorney, would have testified that he saw investigators Buehler and Boucher taking an oral and written statement from petitioner and heard him describe how he met Charles Barlassina, went with him to a room in the Sherman House Hotel, tied him up, choked him, and robbed him of various personal property, including a bus ticket and an attache case. Mr. Kress would further have testified that he heard petitioner describe his subsequent flight to New Orleans, Dallas, and San Francisco.

(3) Maureen Case, document examiner, would have testified that she examined registration cards from a YMCA in New Orleans and a YMCA in Dallas and found the signatures thereon to be identical to petitioner's signature on his fingerprint card.

(4) Detective Owens and Sergeant Kennedy of the San Francisco Police Department would have testified that they arrested petitioner in San Francisco, and various officers of the Washington, D.C. Police Department would have testified that they took defendant from the custody of the San Francisco Police and that on his person at the time was an attache case containing money orders and portions of bus tickets with registration numbers indicating that they had been sold to Charles Barlassina.

(5) Dr. Jerry Kearns, Coroner's pathologist, would have testified that he examined the body of the deceased Charles Barlassina and found that death was due to asphyxiation resulting from external violence.

(6) Investigator Buehler would have testified that he viewed the body of the deceased Charles Barlassina in a room at the Sherman House Hotel, and that the body was tied to a bed with marks visible around the neck.

The court then asked petitioner if he understood that by pleading guilty he was admitting the facts essentially as he had just heard them, and that he would be admitting the charges that had been read to him. Petitioner replied that he understood.

The court then commenced to admonish petitioner, thoroughly and repeatedly, of the consequences of changing his plea to guilty. Petitioner indicated that he understood (1) that he had a right to a jury trial, and what that meant; (2) that by pleading guilty he waived his right to a jury trial; (3) that no trial of any kind would ensue; (4) that he waived his right to call witnesses on his behalf, to cross-examine adverse witnesses, and to take the stand himself; (5) that he need not withdraw his prior plea and could continue to plead not guilty; and (6) that the State and the public

defender had agreed to recommend concurrent sentences of 25-40 years for murder and 5-10 years for robbery, to be served concurrently with the Federal sentence then being served by petitioner.

The court, in a protracted colloquy, continued to warn and advise petitioner of the consequences of his proferred guilty plea. Petitioner manifested that he was entering the plea voluntarily, as a matter of conscience, and that he did, in fact, perform those acts which resulted in the death of Charles Barlassina. The court then accepted petitioner's plea of guilty.

Prior to the imposition of sentence, in place of any presentence report (not then mandatory), the public defender offered a partial rendition of petitioner's psychiatric history to the court. Although he mentioned that petitioner, while in the army six or seven years before, had had problems regarding homosexual activities and had once been hospitalized for psychiatric reasons, the public defender referred chiefly to a report concerning psychiatric examinations which had occurred earlier that year (1972) at St. Elizabeth's Hospital in Washington, D.C. These examinations were apparently conducted at the request of the United States Department of Justice to determine petitioner's competency to stand trial for the prior Federal charges mentioned above.

According to the public defender (the report not having been made part of the record), the report from St. Elizabeth's revealed that petitioner had been diagnosed by the psychiatrists there as an emotionally insecure individual, with strong feelings of suspicion and fear. The public defender went on to say that the psychiatrists at St. Elizabeth's did not feel that petitioner was psychotic, and furthermore, that:

> "Whatever disagreements these doctors had, and they had major disagreements as to the cause, as to the course of treatment, etcetera, the one thing that all of the doctors were in complete agreement on, throughout the entire examination which lasted a matter of months, was the defendant was competent to stand trial, understood the nature and charges pending against him."

Although the public defender made several passing references to the fact that petitioner was currently undergoing psychiatric therapy at the Federal penitentiary in Terre Haute, Indiana, the public defender did not apprise the court of the more recent medical opinions of the psychiatrists there. Thus, when the court remarked that it thought petitioner's competency was "quite obvious with my dialog with the defendant today," it did so without regard to the medical reports from Terre Haute, but with the knowledge that petitioner was receiving psychiatric treatment there.

After the public defender stated that petitioner was "finally getting the psychiatric treatment he needs" at Terre Haute, petitioner stated: "I

regret what happened and everything that has happened. I am coming around through my treatment and I am most anxious to get back to that." The court then imposed sentence.

Subsequently, in 1976, petitioner filed a petition for relief under the Illinois Post-Conviction Hearing Act (Ill. Rev. Stat. 1977, ch. 38, par. 122—1 *et seq.*). Petitioner claimed:

(1) That had the court at the change of plea proceeding been made aware of the Terre Haute medical reports, the court would have been apprised of sufficient evidence to create a bona fide doubt of petitioner's fitness to stand trial or plead;

(2) That the court should have ordered a current psychiatric report;

(3) That petitioner's counsel should have requested a current psychiatric report;

(4) That petitioner's counsel failed to inform himself regarding petitioner's fitness to stand trial or plead;

(5) That petitioner's counsel negligently misrepresented petitioner's competency;

(6) That petitioner never stipulated to the factual basis for his plea nor fully understood the evidentiary facts admitted;

(7) That petitioner was confused during the plea bargaining session;

(8) That petitioner never knowingly waived the presentence investigation report, but was misled by his counsel into doing so;

(9) That petitioner was only anxious to return to his psychiatric treatment and due to mental illness did not fully consider or understand the consequences of his plea;

(10) That petitioner's representation was deficient in that no motion to suppress was ever filed.

Appended to the petition, as Petitioner's Exhibit No. 2, were the medical records of petitioner that were compiled by the Terre Haute medical section during the weeks preceding and following petitioner's plea of guilty.

On appeal, however, petitioner has raised only the following contentions:

(1) That there were facts in existence which would have raised a bona fide doubt of petitioner's fitness to stand trial or plead, but which were not brought to the court's attention;

(2) That the motion to dismiss a post-conviction petition admits the truth of the allegations pleaded and only questions their sufficiency.

The basic thrust of petitioner's argument is that had the trial court been informed of the contents of Petitioner's Exhibit No. 2 (the Terre Haute

medical records), it would have been apprised of sufficient evidence to create a bona fide doubt of petitioner's fitness to change his plea to guilty. These records were made available to the court below at the proceedings on the motion to dismiss the post-conviction petition, and are now before this court.

Taking the facts stated therein as true for purposes of this appeal (*e.g., People v. Santoro* (1973), 13 Ill. App. 3d 426, 301 N.E.2d 175), the records reveal that while petitioner was serving his Federal sentence in the District of Columbia Jail in September-October of 1972, a prison riot occurred and petitioner was sexually assaulted by a number of inmates. This caused petitioner to be very apprehensive and upset, in which state he arrived at Terre Haute, and for which reason he was put on Thorazine, a tranquilizer.

Petitioner's first medical examination at Terre Haute took place on October 24, 1972, a week after his arrival. Noting that petitioner had twice before attempted suicide (once in 1966 and once in 1971), and had recently been sexually assaulted, the examining physician recommended that he be placed in a single cell "for psychiatric reasons." Petitioner was diagnosed as suffering from severe emotional trauma.

On October 30, 1972, petitioner was interviewed by a psychiatrist. Petitioner told the psychiatrist that he was serving a 5 to 15 year sentence and that he had been convicted on a "negotiated plea." He related a chronology of his travels around the United States ending with a description of the homosexual, sadomasochistic episode that resulted in the death of Charles Barlassina in Chicago. He said that the Thorazine had helped him but that he was still very nervous, and that since he had been assaulted he had been hearing voices and having occasional suicidal thoughts.

The psychiatrist's report of his mental examination of petitioner declared:

"I found the patient to be oriented as to time, place and person. His memory was intact for remote, intermediate and recent events. His intelligence was estimated as being average. His speech was spontaneous, relevant and coherent. He tended to include a lot of extraneous detail. His thought associations appeared to be tight and logical."

However, after commenting that petitioner was "obviously obsessed with homosexual and sadomasochistic behavior," the report went on to note:

"His judgment for the events of everyday living appears to be only barely intact. His insight into the psychiatric nature of his present condition is minimal."

Besides his sadomasochistic homosexuality, petitioner was diagnosed as having "schizophrenia, chronic undifferentiated type, APA Code No.

295.90." According to the American Psychiatric Association's Diagnostic-Statistical Manual of Mental Disorders par. 295.90 (2d ed. 1968):

> "This category is for patients who show mixed schizophrenic symptoms and who present definite schizophrenic thought, affect and behavior not classifiable under the other types of schizophrenia."

The psychiatrist recommended continuing the Thorazine in a modified dose and adding three other drugs (Mellaril, Elavil, and Artane), variously described in the reports as "psychoactive medication" and as tranquilizers. The report also recommended possible psychological testing and possible individual psychotherapy. The report then urged that petitioner be returned to the general prison population while his treatment continued.

The following week, on November 6, 1972, petitioner was again examined by the prison psychiatrist. The psychiatrist noted that petitioner appeared "somewhat shaken and quite a bit more anxious." Petitioner admitted that he was very anxious regarding "all of the tension here," referring to a work strike then occurring at the prison. He claimed to be having more auditory and some visual hallucinations. He expressed the fear that there would be a riot and that he would be "raped again." The psychiatrist reported that he questioned petitioner at some length regarding his feelings in this matter, and that they seemed to be well-founded on his contacts with other inmates. The psychiatrist concluded that although petitioner's "reality testing" was lacking in some areas, he felt "that for the most part his reality testing is fairly accurate and that he was reporting the situation here as he sees it from a frightened inmate's standpoint." The psychiatrist recommended that petitioner continue taking a slightly different mix of tranquilizing medication.

An undated hospital report apparently prepared just after this meeting on November 6, 1972, stated that petitioner had become apprehensive, nervous and somewhat withdrawn because of the tension in the prison, resulting in his voluntary admission to the hospital. According to the report, the psychiatrist felt that the deterioration in petitioner's condition was directly proportional to the degree of unrest and tension in the prison population. The report also noted that petitioner's medications had been titrated to help relieve his anxiety and improve his condition, and that as a result his hallucinations had subsided.

Although in two reports mention was made of an appointment on November 20, the next Terre Haute medical report that appears in the record is dated January 8, 1973, six weeks after petitioner's transportation to Chicago and three weeks after petitioner's plea of guilty. While this report, along with the final Terre Haute report, dated February 5, 1973, obviously could not have been considered by the sentencing judge on

December 18, 1972, they are discussed here because they were before the court below at the post-conviction proceeding and are before this court now.

According to the report dated January 8, 1973, petitioner stated that he had been in Chicago to face murder charges, that his guilt rested on "circumstantial evidence," and that he was appealing the case. He then went on to describe that circumstantial evidence as including the following: the fact that property belonging to the Chicago murder victim had been found in his Dallas apartment; the fact that he was unable to account for his whereabouts at the time of the murder; and the fact that the murder in Chicago was similar to the homicide he had committed in Washington, D.C., in that both victims "were involved in a sadomasochistic kind of activity at the time of their death." Petitioner then, according to the report, discussed the sentence that he had received:

> "They gave me 25 to 45 years, but I only have to do 11 years and 3 months under Illinois law. * * * That sentence is running concurrently with the 15 years that they gave me for the first degree manslaughter in Washington. I have to serve 10 of that."

The report also states that petitioner declared that he was on medication throughout the period he was in Chicago. Petitioner declared that he no longer had nightmares or hallucinations and did not believe that he would commit suicide. The report revealed that petitioner had been moved to a two-man cell and had been given a job in the prison laundry. The psychiatrist recommended that he continue on the medication and that he be transferred to a less monotonous, more intellectually stimulating job.

The last Terre Haute medical report is dated February 5, 1973, approximately seven weeks after the change of plea proceedings. The psychiatrist's interview with petitioner on that date revealed that petitioner had been moved to a segregation unit after his cellmate had pulled a knife on him because petitioner had rejected his sexual advances. Petitioner claimed to be hearing voices and experiencing hallucinations as a result of "being locked in a small place." Although the psychiatrist expressed skepticism at petitioner's characterization of the incident, he again described petitioner as schizophrenic and recommended that he continue on the medication. He further recommended that petitioner be transferred to the Medical Center for Federal Prisoners, stating: "This patient needs a specialized type of psychiatric environment that I do not feel we are yet equipped to provide here."

Subsequently petitioner was transferred to the Medical Center for Federal Prisoners, where he has remained. At the post-conviction proceedings petitioner's counsel alluded to medical records from that facility dated October 6, 1973, and June 3, 1974, in which it is stated that petitioner claimed to be hearing voices and experiencing hallucinations.

While these records were apparently before the court at the post-conviction proceedings, they were never made part of the record and are not now before this court.

It is basic that due process is violated where an accused is required to stand trial or plead when he is not competent to do so. (*E.g., Pate v. Robinson* (1966), 383 U.S. 375, 15 L. Ed. 2d 815, 86 S. Ct. 836.) In Illinois the applicable standard for determining whether an accused is fit to stand trial or plead has been codified in section 5—2—1 of the Unified Code of Corrections (Ill. Rev. Stat. 1977, ch. 38, par. 1005—2—1), which provides in pertinent part:

"(a) For the purposes of this Section a defendant is unfit to stand trial or be sentenced if, because of a mental or physical condition, he is unable:

(1) to understand the nature and purpose of the proceedings against him; or

(2) to assist in his defense.

(b) The question of the defendant's fitness may be raised before trial or during trial. The question of the defendant's fitness to be sentenced may be raised after judgment but before sentence. In either case the question of fitness may be raised by the State, the defendant or the court.

(c) When a bona fide doubt of the defendant's fitness to stand trial or be sentenced is raised, the court shall order that a determination of that question be made before further proceedings."

The Illinois Supreme Court has held that post-conviction relief is available where it is shown that, at the time of entry of a guilty plea, there were facts in existence which, had they been known to the trial court, would have raised a bona fide doubt as to the accused's fitness to plead or be sentenced. (*People v. McLain* (1967), 37 Ill. 2d 173, 226 N.E.2d 21; *McDowell v. People* (1965), 33 Ill. 2d 121, 210 N.E.2d 533; *People v. Anderson* (1964), 31 Ill. 2d 262, 201 N.E.2d 394.) Therefore, the specific issue on appeal in this case is whether, if the trial court at the time of the guilty plea had been apprised of the contents of Petitioner's Exhibit No. 2, the Terre Haute medical records set out above, this would have raised a bona fide doubt as to petitioner's fitness to plead or be sentenced. Based on our review of the record, we find that no bona fide doubt of petitioner's fitness would have arisen had the trial court been apprised of the contents of the Terre Haute medical records in addition to the other facts that were presented to the court. Accordingly, we affirm the dismissal of appellant's petition for post-conviction relief.

Because they form the backdrop against which the additional facts not

presented to the court must be considered, we begin with an examination of those facts which were before the court at the change of plea proceeding. In doing so, we are aware that the issue of whether a bona fide doubt of fitness has been raised is in the trial court's discretion. (*E.g.*, *People v. Skorusa* (1973), 55 Ill. 2d 577, 304 N.E.2d 630; *People v. Pridgen* (1967), 37 Ill. 2d 295, 226 N.E.2d 598.) As such, the trial court's determination on the issue will be given great weight by the court on review (*People v. Gibson* (1974), 21 Ill. App. 3d 692, 315 N.E.2d 557), and will only be overturned where an abuse of discretion is shown. *E.g.*, *People v. Logan* (1977), 50 Ill. App. 3d 460, 365 N.E.2d 304; *People v. Carter* (1974), 16 Ill. App. 3d 842, 306 N.E.2d 894; *People v. Nyden* (1973), 14 Ill. App. 3d 804, 303 N.E.2d 601.

The court was informed that petitioner had once been hospitalized for psychiatric reasons, that he was currently undergoing psychiatric therapy at Terre Haute, and that he had been the subject of psychiatric examinations earlier that year. Petitioner was diagnosed as emotionally insecure, with strong feelings of suspicion and fear, but nonpsychotic, and was found competent to stand trial on the Federal charges. Moreover, both the public defender, after conferring with petitioner, and the trial court, after a lengthy dialogue with petitioner, felt that there was no question of petitioner's fitness to plead or be sentenced, while the record bears out the lucidity and coherence of petitioner's replies.

■■ As the court below in the post-conviction proceedings observed, and as numerous cases have held, the mere fact that a defendant suffers some mental disturbance or requires psychiatric treatment does not necessarily raise a bona fide doubt as to his ability to understand the nature and purpose of the proceedings against him or to assist in his defense. (See, *e.g.*, *People v. Richeson* (1962), 24 Ill. 2d 182, 181 N.E.2d 170; *Withers v. People* (1961), 23 Ill. 2d 131, 177 N.E.2d 203.) This is especially applicable where, as here, the defendant manifests to the court and to his counsel a coherence and lucidity inconsistent with a claim of unfitness.

In *People v. Gaines* (1974), 21 Ill. App. 3d 839, 316 N.E.2d 14, the defendant, 17 years old and of at least average intelligence, was found to be mentally disturbed, emotionally ill, and in need of psychiatric care; yet he was found by two examining specialists to be fully aware of the charges against him and perfectly capable of cooperating with counsel. The court observed that there was no previous adjudication of incompetency and no request for a hearing on the issue by the defendant or his counsel. The court also emphasized that the defendant's statements to the trial court were coherent and lucid, such that no facts were presented which should have raised a bona fide doubt as to the defendant's fitness.

In *People v. Carter* (1974), 16 Ill. App. 3d 842, 306 N.E.2d 894, the

defendant had sustained a blow to his head while young, after which he underwent a personality change and developed a drinking problem which manifested themselves in sociopathic behavior. The defendant alleged that he had been consulting psychiatrists and his counsel stated that he was unable to co-operate in his defense. The court held that the mere fact that the defendant suffered some mental disturbance and the bare allegation of his counsel were insufficient to raise a bona fide doubt of his unfitness. The court emphasized that the trial court had observed the interaction of the defendant and his counsel and had personally questioned the defendant at length concerning his negotiated plea, during which the defendant manifested an understanding of the proceedings and a rationality inconsistent with a claim of incompetency.

In *People v. Gibson* (1974), 21 Ill. App. 3d 692, 315 N.E.2d 557, a psychiatrist's finding that the defendant suffered from a progressive type of mental disorder was held insufficient to raise a bona fide doubt of the defendant's fitness where he had been found competent three months before and where "he appeared to be quite lucid and displayed a remarkable understanding of his procedural rights."

More recently, in *People v. Richardson* (1978), 61 Ill. App. 3d 718, 377 N.E.2d 1235, the defendant alleged that he was unable to remember anything about the crimes charged and therefore was unable to cooperate in his defense. He also alleged that he had been hospitalized in a mental health center several years before and that he had attempted suicide. The court held that no bona fide doubt of the defendant's fitness had been raised by these allegations in view of the lucidity and awareness demonstrated by the defendant in the trial court.

By way of contrast, in *People v. Cole* (1978), 61 Ill. App. 3d 1007, 378 N.E.2d 381, while affirming that evidence of prior treatment for mental illness, even if recent or frequent, is not conclusive of a defendant's fitness, the court held that the fact that the defendant had spent over 20 years in State mental institutions and was currently incarcerated in a prison psychiatric division, in addition to the statement of his counsel that he was unable to cooperate in his defense, raised a bona fide doubt of the defendant's competency.

Several other recent cases also emphasize that the mere presence of a mental disturbance does not necessarily raise a bona fide doubt of an accused's fitness, particularly where he appears rational and coherent to the trial court. See, *e.g.*, *People v. Perkins* (1977), 53 Ill. App. 3d 412, 368 N.E.2d 675; *People v. Logan* (1977), 50 Ill. App. 3d 460, 365 N.E.2d 304; *People v. Pack* (1976), 34 Ill. App. 3d 894, 341 N.E.2d 4.

■■ Therefore, we find that the trial court was well within its discretion in concluding that no bona fide doubt of petitioner's fitness was raised by the fact that he had been diagnosed as emotionally insecure and was

currently receiving psychiatric treatment, where he had also been found to be nonpsychotic and competent to stand trial and where he appeared lucid and coherent both to the trial court and to his counsel.

We next consider whether, if in addition to the facts just set out, the trial court had been apprised of the contents of the Terre Haute medical records, there then would have arisen a bona fide doubt as to petitioner's fitness. Petitioner contends that such a doubt would have arisen had the trial court been aware that he had been diagnosed as schizophrenic, that he had a history of suicide attempts, that he claimed to be suffering from auditory and visual hallucinations, that he was taking tranquilizing medication, and that his judgment for the events of everyday living was thought to be barely intact. However, we believe that a closer examination of the medical records, taken as a whole and viewed against the backdrop of those facts of which the trial court was aware, reveals that no bona fide doubt would have arisen even if the records had been presented to the trial court.

Petitioner emphasizes that he was diagnosed as schizophrenic, based on the psychiatrist's examination of him and on his statements that he was suffering hallucinations and had twice before attempted suicide. However, we note that the precise label attached to petitioner's condition was "Schizophrenia, chronic undifferentiated type," a catch-all category for nonpsychotic patients exhibiting "mixed schizophrenic symptoms." Noting that the trial court was aware that petitioner was suffering some mental disturbance, yet thought his competency "quite obvious," we doubt whether the mere addition of the label "undifferentiated schizophrenia" would have held any particular significance. In *People v. Nyden* (1973), 14 Ill. App. 3d 804, 303 N.E.2d 601, the petitioner's condition was characterized as "Ambulatory Schizophrenic Reaction" and a "full Schizophrenic Reaction with a break in reality" was predicted to occur in the future. Yet, in the very same report on which he sought to rely, the petitioner was found able to understand the nature of the charges against him and to cooperate with his counsel. The court held that the defendant had failed to show any facts which would have raised a bona fide doubt of his competency.

Similarly, in this case, in the very same report in which petitioner was diagnosed as schizophrenic and on which he seeks to rely, there appears material which would have prevented a bona fide doubt of his fitness from arising. In the report dated October 30, 1972, petitioner told the psychiatrist that he was serving a 5- to 15-year sentence on a "negotiated plea." He then related a chronology of his travels around the country, leading up to a narration of how he met Charles Barlassina and came to murder him. Most significant, the report then contains the psychiatrist's findings as to petitioner's condition, which we repeat here:

"I found the patient to be oriented as to time, place and person. His memory was intact for remote, intermediate and recent events. His intelligence was estimated as being average. His speech was spontaneous, relevant and coherent. * * * His thought associations appeared to be tight and logical."

Had the trial court been apprised of this diagnosis, against the backdrop of petitioner's lucidity and coherence in his discussions with court and counsel, we believe that it would only have reinforced the court's conclusion that there was no question as to petitioner's competency to stand trial. And although the report also mentioned that petitioner's "judgment for the events of everyday living" appeared to be only "barely intact," as the Illinois Supreme Court has said:

"If the defendant does understand the nature and object of the charges against him and can, in co-operation with his counsel, conduct his defense in a rational and reasonable manner, then he is mentally competent to stand trial although upon other subjects his mind may be unsound. [Citations.]" *Withers v. People* (1961), 23 Ill. 2d 131, 135, 177 N.E.2d 203.

The Terre Haute reports also revealed that petitioner was nervous, apprehensive, and upset when he arrived at Terre Haute, and that his tension and anxiety increased there. The report dated November 6, 1972, also noted that petitioner's "reality testing" was lacking in some areas. However, the same report indicated that petitioner's "reality testing" was, for the most part, accurate, and that his tension and anxiety were well rooted in the unfortunate realities of prison life. Again, while petitioner did seem to be suffering from some mental disorder, it was not of such nature or magnitude as to raise a doubt of his ability to understand the nature of the proceedings or to assist in his defense.

Petitioner next raises the issue of the tranquilizing medication prescribed to him on an outpatient basis in order to relieve his anxiety. We note first that petitioner does not allege that the medication rendered him unfit, only that no determination was made of its possible effect on his fitness. The mere fact that an accused is taking tranquilizing medication is insufficient to raise a bona fide doubt as to his fitness. Moreover, the undated report made shortly after November 6, 1972, revealed that petitioner's condition had improved as a result of the medication. In *People v. Dalfonso* (1974), 24 Ill. App. 3d 748, 321 N.E.2d 379, noted in 25 DePaul L. Rev. 217 (1975), the court expressly held that an accused may be tried even where his fitness is actually the result of his use of tranquilizing medication. (Accord, *People v. Jackson* (1978), 57 Ill. App. 3d 809, 373 N.E.2d 583.) In this case, we have no reason to believe that the fact that petitioner was being treated with tranquilizers on an outpatient

basis to relieve his anxiety would have generated any doubt in the mind of the trial court as to his fitness.

Petitioner also contends that his erroneous statement, upon his return to Terre Haute from Chicago, that his case was on appeal to a higher court, as well as his subsequent transfer to the Medical Center for Federal Prisoners for more specialized psychiatric treatment, indicate that there was a doubt as to his competency at the change of plea proceeding. While these events occurred after the change of plea proceeding and thus could not have been considered by the trial court, there is some authority for considering later events when ruling on a post-conviction petition attempting to raise a bona fide doubt as to competency. *People v. Owens* (1978), 57 Ill. App. 3d 157, 372 N.E.2d 857; see also *Withers v. People* (1961), 23 Ill. 2d 131, 177 N.E.2d 203; *People v. Walton* (1973), 15 Ill. App. 3d 896, 305 N.E.2d 395.

But when, at petitioner's urging, we review the medical reports made after his return to Terre Haute, we again find material which goes against his contention that there was a bona fide doubt as to his competency on December 18, 1972. In the report dated January 8, 1973, discussed above, petitioner displayed a remarkably clear understanding of the nature and purpose of the proceedings against him, the evidence against him, and the consequences of his guilty plea under Illinois law. The same report also noted that petitioner's condition had considerably improved since November 6, 1972. Finally, the same report revealed that petitioner was thought sound enough to be placed in a two-man cell and to be given a job in the prison laundry, a job which, the psychiatrist felt, was not sufficiently intellectually stimulating for him. While petitioner's subsequent transfer "may indicate that the individual needs some form of psychiatric treatment, it does not follow that he lacks the mental capacity to stand trial." (*People v. Richeson* (1962), 24 Ill. 2d 182, 184, 181 N.E.2d 170. In the face of his lucidity and coherence before, during, and after the change of plea proceeding, as attested by the court, his counsel, his psychiatrist, and his own words, we cannot hold that there would have been a bona fide doubt of petitioner's competency had the trial court been apprised of the contents of the Terre Haute medical records in addition to the other facts of which it was aware.

The cases cited by petitioner are distinguishable. In *Pate v. Robinson* (1966), 383 U.S. 375, 15 L. Ed. 2d 815, 86 S. Ct. 836, the defendant had a long history of highly irrational and bizarre behavior and was able to offer four witnesses' testimony in support of his insanity. In *People v. Santoro* (1973), 13 Ill. App. 3d 426, 301 N.E.2d 175, the defendant had previously been found incompetent and thus enjoyed a presumption that the condition persisted.

Of the other cases cited by petitioner, in each there is either stronger evidence of incompetency, or no indication that the trial court was apprised of any evidence of incompetency, or both. In *People v. Chambers* (1976), 36 Ill. App. 3d 838, 345 N.E.2d 119, the defendant had twice been diagnosed as a paranoid schizophrenic, a more extreme disorder than petitioner's. More serious to the court, however, was that the defendant's own testimony reflected an inability to communicate rationally with his counsel or to correlate and narrate the events pertinent to the office charged. Similarly, in *People v. Clardy* (1975), 27 Ill. App. 3d 188, 326 N.E.2d 193, the defendant's condition was diagnosed as catatonic schizophrenia and characterized by bizarre outbursts and mental lapses. He also refused to talk to his counsel or to participate in court in any fashion. So also in *People v. Salvaggio* (1976), 38 Ill. App. 3d 482, 348 N.E.2d 243, the defendant's counsel expressed question as to the defendant's ability to understand the proceedings, the trial court itself acknowledged that the defendant's understanding was not clear, and the record showed it was questionable whether the defendant was able to cooperate with his counsel.

In *McDowell v. People* (1965), 33 Ill. 2d 121, 210 N.E.2d 533, the defendant had been committed to a State mental hospital and was found to be suffering from a sociopathic personality disturbance. He was receiving psychiatric treatment and was confined in the psychiatric division of the jail at the time of his guilty plea, and had twice attempted suicide. Because the trial court had not been apprised of any of this information, the court on appeal held that a bona fide doubt of defendant's fitness might well have arisen in the trial court's mind. In contrast, in the present case the trial court was aware that petitioner was receiving psychiatric treatment and took that into consideration along with its own observations and the information related by petitioner's counsel in finding that there was no doubt of petitioner's competency.

Similarly, in *People v. McLain* (1967), 37 Ill. 2d 173, 226 N.E.2d 21, because the trial court did not know of the defendant's judicially ordered commitments for mental illness or that he had been diagnosed as a catatonic schizophrenic and had been brought immediately from a confinement for mental illness to arraignment, the court on appeal could not say that the trial court might not have found a bona fide doubt as to the defendant's competency. This was also the situation in the other two cases cited by petitioner. In *Costas v. People* (1956), 9 Ill. 2d 534, 138 N.E.2d 468, the 66-year-old petitioner, in a state of utter despondency, had insisted to his attorneys that they should try to secure the death penalty for him, and one of his attorneys swore that the defendant was unable to cooperate in his own defense. Because there was no indication that the trial judge was aware of these facts at the petitioner's change of

plea proceeding, the court ruled that the trial judge might well have refused to accept the plea of guilty until petitioner's competency had been determined.

Lastly, in *People v. Walton* (1973), 15 Ill. App. 3d 896, 305 N.E.2d 395, the defendant was diagnosed as paranoid schizophrenic and found incompetent to stand trial less than six months after he was tried and sentenced. In addition, his counsel represented that he lacked competency at the time of trial, although he seemed able to testify coherently. Because nothing had been brought to the attention of the trial judge to suggest that the defendant was mentally ill, the court on appeal was reluctant to hold that a bona fide doubt might not have arisen in the trial judge's mind.

In contrast, in the case at bar the trial court was apprised of the fact that petitioner was undergoing psychiatric therapy. Nevertheless, based on his observation of and dialogue with petitioner, on the reliance of petitioner's counsel that petitioner was competent, and on the finding earlier that year that petitioner was competent, the trial court found that there was no doubt but that petitioner was competent. Although the Terre Haute medical records more specifically described the nature of petitioner's mental illness and revealed that he was taking tranquilizers, taken as a whole and viewed against the backdrop of those facts that were presented to the trial court, we do not feel that they would have raised a bona fide doubt of petitioner's fitness. In fact, we feel that the findings of the psychiatrist that petitioner's thought was oriented, relevant, coherent, tight, and logical, and the demonstrations of these qualities in petitioner's own narratives, would only have affirmed petitioner's ability to understand the proceedings and assist in his defense.

Because we find that no bona fide doubt of petitioner's fitness would have been raised by the additional facts presented in the petition for post-conviction relief, the dismissal of the petition in the court below is affirmed.

Affirmed.

PERLIN and BROWN, JJ., concur.