THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* EARL JONES, Defendant-Appellant.

First District (3rd Division)   No. 79—2344

Opinion filed September 8, 1982.

James J. Doherty, Public Defender, of Chicago (John T. Keefe and James H. Reddy, Assistant Public Defenders, of counsel), for appellant.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat, Joel A. Stein, and Gloria G. Coco, Assistant State's Attorneys, of counsel), for the People.

JUSTICE McGILLICUDDY delivered the opinion of the court:

The defendant, Earl Jones, was convicted at a bench trial of the murders of his wife and two-year-old stepdaughter. He was sentenced to two concurrent terms of 50 to 100 years' imprisonment.

On appeal, the defendant argues that he was not proved sane beyond a reasonable doubt and that the trial court erred in failing to order fitness hearings at the preliminary hearing and arraignment, on the date of trial and before sentencing.

On July 16, 1976, at approximately 3:30 p.m., Florence Jones, the defendant's neighbor, saw the defendant carry a sawed-off shotgun into his house. At about 3:45 p.m., she heard two firecracker-like noises. Approximately 35 to 40 minutes later, she saw the defendant, who was carrying the shotgun and a dufflebag, come out of the house and walk down the street with his three-year-old son.

Dan Wallace, the defendant's stepfather, testified that he saw the defendant at approximately 6 p.m. on July 16. The defendant told him to call the morgue because "he had some corpses." In Wallace's opinion, the defendant appeared calm and normal. Wallace further testified that the defendant had been hospitalized on several occasions for mental illness but appeared normal after his discharges.

Several Chicago police officers also testified concerning the defendant's behavior on the day of the murders. Officers Leon Cammon and Melvin Malcolm testified that they arrived at the defendant's apartment at about 10:25 p.m. and that the defendant admitted the shootings and showed them the corpses in a partially filled bathtub covered with sheets, bed articles and towels. As the officers walked through the apartment to the bathroom, they noticed bloodstains on the dining room walls and floor. Blood on the dining room floor had been wiped with a dry mop. A dismantled sawed-off shotgun and several shotgun shells were found on the floor. The officers stated that they stayed with the defendant for about 15 to 20 minutes and that during their questioning of him, the defendant appeared very calm, rational, placid and relaxed. The defendant gave no reason for shooting his stepdaughter but told Officer Cammon that he killed his wife because she wanted to engage in sex with him.

Officer James Stephens, who transported the defendant to the police station, testified that the defendant's responses to questions were rational, cooperative and coherent. The defendant stated that he killed his wife because she was "messing around." Officer Stephens

said that the defendant gave some irrational responses to questions at the police station when he said to ask his son why he had committed the crime and when he claimed that "the radio static told him to do it." Stephens believed that these latter responses were made by the defendant after he had second thoughts about being cooperative.

Investigator Paul Parizanski, who interviewed the defendant for about 15 minutes at the station, stated that the defendant refused to discuss the murders without first talking to an attorney. Investigator Parizanski said the defendant acted in a sane manner and that his answers to general questions were responsive, straightforward and coherent.

All four officers testified that they believed the defendant appreciated the criminality of his conduct and that he could have conformed his conduct to the requirements of the law.

The final witness for the State was Abdul Rockman. Rockman had known the defendant for 15 years and testified concerning the marriage of his sister to the defendant. Rockman stated that the defendant was a devout Hebrew Israelite and obeyed the scriptures and religious requirements. He found the defendant to be responsive and coherent at frequent family gatherings and saw nothing unusual about the defendant's behavior during June and July 1976. Rockman further testified that on July 13, 1976, the defendant spoke with him about his marital problems. The defendant stated that he was displeased with his wife's treatment of the children and himself. When the defendant left Rockman's apartment, he said he was "not going to be responsible for whatever happens." Rockman testified that he believed that the defendant realized the difference between right and wrong and that he could appreciate the criminality of his actions and that he could conduct himself according to the law.

On defense, Doctor Edward Kelleher, a psychiatrist, testified concerning his six examinations of the defendant from 1973 to 1977. He also reviewed the defendant's medical records and history of mental illness. According to those records, the defendant exhibited psychotic symptoms in 1968 while in an army hospital after serving a few months in Vietnam. At that time, the defendant possessed an abnormal attitude and an extreme fervor toward his religion and suffered delusions about things happening to his body. The defendant also received treatment in a veteran's hospital in Pennsylvania; and in 1969 and 1970 the defendant was diagnosed as mentally sick and unfit to stand trial after a shooting incident in Arkansas. The defendant was hospitalized in Chicago in April 1972 at which time he was diagnosed as acutely psychotic. The defendant was transferred to a veteran's facility and was discharged against medical advice that same year.

Doctor Kelleher further testified that the defendant's records showed that in 1973 he was sent to the Illinois State Psychiatric Institute for a court-ordered psychiatric examination after having been charged with aggravated battery. The defendant was hallucinating and was diagnosed as having a paranoid type of schizophrenia and was found unfit to stand trial. Doctor Kelleher examined the defendant in November 1974 and found the defendant had improved sufficiently and could stand trial. Doctor Kelleher testified at that trial, and the defendant was acquitted by reason of insanity and received medical treatment until he was discharged in December 1975.

On September 2, 1976, Doctor Kelleher examined the defendant to determine his fitness to stand trial for the instant homicides. At that time, the defendant spoke rapidly and had poor contact with reality. He became delusional and disorganized in his thought processes. He showed no emotion when he discussed the shootings and stated that he shot his wife because she vexed him and that his three-year-old son instructed him to place the bodies in the bathtub and to clean up. Doctor Kelleher diagnosed the defendant as paranoid schizophrenic and found him unfit to stand trial. The defendant was again examined by Doctor Kelleher on September 21, 1976, and he made the same diagnosis.

Based on his personal interviews with the defendant as well as his review of the defendant's medical records and staff reports of interviews with the defendant's relatives, Doctor Kelleher concluded that on July 16, 1976, the defendant was suffering from a paranoid type of schizophrenia. He testified that in layman's terms, the defendant's condition could be described as crazy, psychotic or insane. Doctor Kelleher also concluded that as a result of that mental illness, the defendant was not able to appreciate the criminality of his conduct or conform his conduct to the requirements of the law. He stated that people suffering from schizophrenia could appear for a period of time to be normal or rational to lay persons.

On cross-examination, Doctor Kelleher stated that a person diagnosed as schizophrenic, paranoid type, who is in the state of remission, can appreciate the criminality of his conduct and conform his conduct to the requirements of the law. He admitted that when he examined the defendant in November 1974, in April 1975 and in April 1977, the defendant's schizophrenic symptoms were in the state of remission. Doctor Kelleher also admitted that the defendant had been diagnosed by his treating psychiatrist in February 1975 as symptom free for four or five months and had not required any psychotropic medication during that time nor in April 1977.

In rebuttal, the State called Doctor Werner Tuteur, an expert in

the field of psychiatry and psychoanalysis. Doctor Tuteur examined the defendant on February 6, 1978, and reviewed the police report of the homicides and reports of psychiatric examinations of the defendant at certain mental hospitals. During the examination, the defendant told Doctor Tuteur that he had quarreled with his wife regarding financial matters and that he killed her because she had committed adultery. The defendant said he killed his stepdaughter because she was the issue of that adultery. Doctor Tuteur stated that the defendant had formed a motive for the killings, was in full contact with reality at that time and was aware of the religious commandment against killing. Doctor Tuteur noted that because the defendant had carried a gun into his house on the day of the homicides, he had formed an intent to kill and was planning that act. In Doctor Tuteur's opinion, the defendant's capacity to appreciate the criminality of his act was not substantially decreased by reason of mental disease and he could have conformed his conduct to the requirements of the law.

In surrebuttal, the defense called Doctor Robert Reifman, a psychiatrist and director of the Illinois State Psychiatric Institute. Doctor Reifman conducted a court-ordered examination of the defendant on July 30, 1976, to determine the defendant's fitness to stand trial. Doctor Reifman stated that the defendant was paranoid, hostile, suspicious and out of touch with reality. The defendant was unable to give a coherent, meaningful explanation of the reasons for his arrest or to discuss court procedures. Doctor Reifman diagnosed the defendant's condition as a paranoid type of schizophrenia. He had no opinion regarding the defendant's sanity at the time of the homicides but stated that a person's ability to plan a crime was not indicative *per se* of that person's sanity.

Based upon the above-stated evidence, the trial judge found the defendant guilty of the murders of his wife and stepdaughter.

The defendant first contends that the guilty verdicts were improper since the evidence adduced at trial raised a reasonable doubt of his sanity.

In Illinois, a person is not criminally responsible for his conduct if at the time of that conduct, as a result of mental disease or mental defect, he lacks substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law. (Ill. Rev. Stat. 1975, ch. 38, par. 6—2(a).) While the law presumes all individuals to be sane, a defendant may overcome this presumption by presenting some evidence to raise a reasonable doubt of his sanity. Once this defense is raised, the presumption no longer prevails and the State must prove beyond a reasonable doubt that the defendant was sane at the time of the alleged crime. (*E.g.*, *People v.*

*Brown* (1982), 104 Ill. App. 3d 1110, 433 N.E.2d 1081; *People v. Pitts* (1982), 104 Ill. App. 3d 451, 432 N.E.2d 1062.) In ascertaining the defendant's sanity, the trier of fact must weight the totality of the evidence and determine the credibility of both lay and expert witnesses. The trier of fact is not required by law to accept the opinions of psychiatrists. (*People v. Johnson* (1981), 101 Ill. App. 3d 1060, 428 N.E.2d 1133; *People v. Varnado* (1978), 66 Ill. App. 3d 413, 384 N.E.2d 37.) The determination of the credibility of witnesses and the weight to be given to their testimony are functions of the trier of fact (*People v. Johnson*); and its finding of sanity will not be disturbed on review unless that finding is so improbable or unsatisfactory as to raise a reasonable doubt concerning the defendant's sanity. *People v. Brown.*

In the instant case, testimony regarding the defendant's sanity was given by lay and expert witnesses. The defendant contends, however, that the testimony of his expert witness, Doctor Kelleher, was more persuasive and credible than testimony by the State's witnesses because Doctor Kelleher's conclusions were based on numerous personal examinations of the defendant, on interviews with relatives of the defendant and on the numerous and voluminous records of the defendant's medical history. The defendant further argues that Doctor Kelleher's opinion that the defendant was insane was not overcome by the opinion of the State's rebuttal witness, Doctor Tuteur, since Doctor Tuteur's conclusions were based on one examination of the defendant that occurred almost 19 months after the homicides and lasted less than two hours and since Doctor Tuteur had not administered any tests, had not spoken to persons having contacts with the defendant and had not read reports about the defendant's experiences in the army. These arguments, however, concern the credibility of the witnesses; and, as stated above, it was the function of the trier of fact to observe the demeanor of the witnesses and to determine credibility.

■ Upon review of the record, we find there was sufficient evidence adduced at trial to support the finding of the defendant's sanity at the time of the homicides beyond a reasonable doubt. In addition to the expert testimony of Doctor Tuteur, numerous lay witnesses, who observed the defendant's conduct and conversed with him shortly before and after the homicides, testified that the defendant's behavior was normal and coherent and that the defendant appreciated the criminality of his conduct and could have conformed his conduct to the requirements of the law. Thus, we cannot say that the trial court's conclusion that the defendant was sane at the time of the homicides was improbable, unsatisfactory or palpably erroneous.

The next issue raised on appeal is whether the trial court erred in

failing to order fitness hearings at the preliminary hearing and arraignment, on the date of trial and before sentencing.

■ Although the defendant did not raise these errors in his post-trial motion for a new trial, we will address this issue because it would violate the fundamental constitutional guarantee of due process to convict a defendant who is mentally unfit to stand trial. *Pate v. Robinson* (1966), 383 U.S. 375, 15 L. Ed. 2d 815, 86 S. Ct. 836; *People v. Rangel* (1982), 104 Ill. App. 3d 695, 432 N.E.2d 1141; *People v. Davis* (1978), 65 Ill. App. 3d 580, 382 N.E.2d 594; see 73 Ill. 2d R. 615(a).

The record in the case at bar shows that a court-ordered psychiatric examination of the defendant occurred on August 2, 1976, and that the defendant was diagnosed as not fit to stand trial at that time. It is not clear from the record, however, when the court received the results of this examination and whether the trial judges at the preliminary hearing on August 9 and at the arraignment on August 16 were aware of that diagnosis. No transcript of the preliminary hearing was made a part of the record. At the arraignment, the Public Defender entered his appearance,[1] acknowledged receipt of the information and waived its reading. The defendant entered a plea of not guilty.

After subsequent hearings and court-ordered psychiatric examinations, the defendant was adjudged not fit to stand trial. On May 13, 1977, a restoration hearing was held and the defendant was adjudged mentally fit to stand trial. On August 4, 1977, when Doctor Kelleher examined the defendant to determine his sanity at the time of the homicides, he also concluded that "this defendant [was] still in need of mental hospital treatment." The defendant's trial commenced on March 28, 1979, and he was pronounced guilty on April 4, 1979. On the latter date, the Public Defender requested a fitness hearing for purposes of sentencing and an examination was conducted on April 25, 1979. The defendant was diagnosed as fit for sentencing. The doctor noted that the defendant had not received his medication for two days and "this should be reinstituted as quickly as possible." The defendant was sentenced on May 9, 1979.

The defendant argues that a *bona fide* doubt of his fitness existed at the preliminary hearing and arraignment and that those proceedings should not have occurred until a fitness hearing was conducted. He contends that his fitness was again in doubt at the time of trial

---

[1]At a hearing held on July 19, 1976, the defendant indicated he would be representing himself. However, the trial court asked a public defender to assist the defendant and "stand by."

since he had not been re-examined for almost two years despite his lengthy history of mental illness. Finally, the defendant argues that he was entitled to an adversarial hearing on fitness prior to his sentencing and that his fitness was doubtful at that time since he was receiving erratic medication.

At the time of the proceedings in the case at bar, the standards and procedural rules governing the issue of fitness to stand trial and to be sentenced were codified in section 5—2—1 of the Unified Code of Corrections (Ill. Rev. Stat. 1975 & 1977, ch. 38, par. 1005—2—1 (effective December 28, 1979, these standards and procedural rules were revised and are now in the Code of Criminal Procedure of 1963, sections 104—10, 104—11 (Ill. Rev. Stat. 1981, ch. 38, pars. 104—10, 104—11))). Section 5—2—1 provided:

> "(a) For the purposes of this Section a defendant is unfit to stand trial or be sentenced if, because of a mental or physical condition, he is unable:
>
> (1) to understand the nature and purpose of the proceedings against him; or
>
> (2) to assist in his defense.
>
> (b) The question of the defendant's fitness may be raised before trial or during trial. The question of the defendant's fitness to be sentenced may be raised after judgment but before sentence. In either case the question of fitness may be raised by the State, the defendant or the court.
>
> (c) When a bona fide doubt of the defendant's fitness to stand trial or be sentenced is raised, the court shall order that a determination of that question be made before further proceedings."

The decision of whether or not a *bona fide* doubt of fitness is raised rests within the discretion of the trial court (*People v. Salvaggio* (1976), 38 Ill. App. 3d 482, 348 N.E.2d 243); and once facts are brought to the court's attention which raise a *bona fide* doubt of a defendant's fitness, and where neither the defendant nor the State raise the issue, it is incumbent upon the trial court to do so. (*People v. Stribling* (1982), 104 Ill. App. 3d 969, 433 N.E.2d 967.) Great weight is given to the trial court's determination of the defendant's fitness since, unlike the reviewing court, the trial court observed the defendant and evaluated his conduct. (*People v. Murphy* (1978), 72 Ill. 2d 421, 381 N.E.2d 677.) The trial court's determination will be overturned only where an abuse of discretion is shown. *People v. Davis* (1978), 65 Ill. App. 3d 580, 382 N.E.2d 594.

In the instant case, the judge presiding at the preliminary hearing had previously, at a prior hearing, ordered a psychiatric ex-

amination of the defendant. It is unclear from the record, however, whether the trial judge had received or was aware of the report and diagnosis of unfitness at that time. Furthermore, as there is no transcript of the preliminary hearing, we cannot speculate as to the nature of the proceedings, the knowledge of the trial court or the appearance, cooperativeness and competence of the defendant at the preliminary hearing. (See *People v. Edwards* (1978), 74 Ill. 2d 1, 383 N.E.2d 944, *cert. denied* (1979), 442 U.S. 931, 61 L. Ed. 2d 299, 99 S. Ct. 2862; *People v. Sanders* (1975), 34 Ill. App. 3d 253, 339 N.E.2d 33.) We must presume that the trial court's actions were in conformity with the law and that the facts before the court were sufficient to support the conclusion. (*Wade v. Gentle* (1981), 101 Ill. App. 3d 1042, 428 N.E.2d 1085.) We further believe that the defendant was not prejudiced by the court's failure to determine the defendant's fitness at this time since the purpose of the preliminary hearing was to determine whether probable cause to believe that he had committed the homicides existed (see Ill. Rev. Stat. 1975, ch. 38, pars. 102—17, 109—3) and since the defendant does not contend that probable cause was absent.

■ The transcript of the arraignment reveals that the judge who presided therein was not made aware of the defendant's psychiatric examination nor was the issue of the defendant's fitness placed in doubt. The defendant's trial counsel did not indicate that the defendant did not understand the proceedings or that he was unable to assist in his defense. It is presumed that defendant's counsel would have informed the trial court if he believed that a *bona fide* doubt of the defendant's fitness existed. (*People v. Rangel* (1982), 104 Ill. App. 3d 695, 432 N.E.2d 1141.) The record shows that the defendant conducted himself in a coherent manner and in fact responded appropriately to the question of whether he was represented by counsel. Thus, we cannot say that the trial court committed error by arraigning the defendant nor do we find the defendant was prejudiced by the occurrence of those proceedings since he pleaded not guilty and had not jeopardized his rights or defenses.

The defendant further contends that his fitness to stand trial should have been redetermined before his trial in March 1979 because almost two years had elapsed since his last psychiatric examination and since he had a history of mental illness. He also contends that a *bona fide* doubt of his fitness existed when on August 4, 1977, Doctor Kelleher examined the defendant for purposes of determining his sanity at the time of the homicides and found that the defendant was still in need of mental hospital treatment.

■ Prior mental problems or even prior commitment to a mental

hospital does not raise a *bona fide* doubt of the defendant's fitness to stand trial. (*People v. Mitchell* (1974), 19 Ill. App. 3d 197, 311 N.E.2d 223.) Furthermore, the mere fact that a defendant suffers from mental disturbances or requires psychiatric treatment does not necessarily raise a *bona fide* doubt of his ability to understand the nature and purpose of the proceedings against him or to assist in his defense. *People v. Davis* (1978), 65 Ill. App. 3d 580, 382 N.E.2d 594.

In the instant case, the trial court and defense counsel had ample opportunity to view the defendant's conduct throughout the pretrial proceedings. Defense counsel, who would have been the first to know whether the defendant was unable to assist in his defense, never questioned the defendant's fitness and instead assisted the defendant in preparing for trial. During pretrial proceedings, the defendant consistently answered ready for trial and demanded trial. Immediately prior to trial, the defendant executed a jury waiver and was admonished by the trial court regarding his understanding of that waiver. Finally, we note that within a month after the defendant's conviction, he was again examined and found to be fit. As the defendant does not rely on the record to show manifestations of incoherence or irrationalness to support his claim of unfitness (see *People v. Stribling* (1982), 104 Ill. App. 3d 969, 433 N.E.2d 967), we will not substitute our judgment for that of the trial court who observed the defendant and evaluated his conduct.

The defendant's final argument is that a *bona fide* doubt of fitness existed at the time of sentencing since the post-trial psychiatric report indicated that the defendant's medication was being erratically administered. He also contends that he was entitled to an adversarial fitness hearing prior to sentencing and that the court-ordered psychiatric examination did not satisfy the legal requirement for an adversarial proceeding.

After trial but prior to sentencing, the Public Defender requested a fitness hearing. Although the trial court initially denied this request, he reconsidered the issue and ordered a psychiatric examination. The Public Defender agreed to the examination and the defendant was diagnosed as fit for sentencing. At the sentencing hearing, the defendant elected to be sentenced under the old law providing indeterminate sentencing and, apparently without the aid of counsel, asked for a 30-day stay of *mittimus*.

Based on the above facts, we do not believe that the trial court abused its discretion when it proceeded with sentencing after having ordered a psychiatric examination, the results of which stated that the defendant understood the nature of the charges and possible sentences and was able to cooperate with his attorney and the court

in sentencing procedures. Despite the psychiatrist's finding that the defendant had not received medication for two days, the defendant was diagnosed as fit to be sentenced. The defendant's behavior at the sentencing hearing, as demonstrated in the record, does not indicate a contrary conclusion. Therefore, we must rely on the trial court's observation and evaluation and hold that there is no basis in the record for us to find an abuse of discretion in finding the defendant fit and proceeding to sentencing.

We also do not believe that the trial court erred in failing to hold a fitness hearing prior to sentencing since there was no statutory requirement to do so. The governing statute at that time provided that when a *bona fide* doubt of the defendant's fitness to be sentenced is raised, "the court shall order that *a determination* of that question be made before further proceedings" (emphasis added) (Ill. Rev. Stat. 1977, ch. 38, par. 1005—2—1(c)). The statute further provided that when the question of the defendant's fitness "is raised after commencement of the trial, the question shall be determined by the court." Ill. Rev. Stat. 1977, ch. 38, par. 1005—2—1(d). *Cf.* Ill. Rev. Stat. 1971, ch. 38, par. 104—2, repealed by Pub. Act 77—2097, sec. 8—5—1, effective January 1, 1973 (when competency in doubt after judgment but before sentencing, the determination of competency shall be made at a hearing and the court shall impanel a jury unless the defendant waives his right to a jury).

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

WHITE, P. J., and McNAMARA, J., concur.