THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. HARRY L. WRIGHT, JR., Defendant-Appellant.

Fifth District   No. 5—85—0272

Opinion filed June 28, 1988.

574

Harry L. Wright, Jr., of Menard, appellant *pro se*.

Charles Roberts, State's Attorney, of Olney (Kenneth R. Boyle, Stephen E. Norris, and Matthew E. Franklin, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE KARNS delivered the opinion of the court:

Defendant, Harry L. Wright, was convicted in a jury trial of attempted murder and sentenced by the circuit court of Richland County to serve a 30-year sentence consecutively to two 15-year sentences imposed in another proceeding. Defendant appeals. We affirm.

In the early afternoon of June 13, 1984, Ernest Johnson, a State policeman, was patrolling the Clay County area. He heard a dispatch that Marion County authorities were seeking a green or blue Plymouth, with rear end damage, that was being driven by a tall, gray-haired man wearing a blue shirt and cap. At about 1:30 p.m., Johnson spotted in the Flora area a man wiping off the rear of a car similar to the one described in the dispatch. Johnson noted the license number on the car, but when he circled back to check for rear end damage, the car was gone. Johnson stopped at a gas station and told Sergeant Norman Rinehart, a State trooper on duty in Flora, about the car. The two officers began searching for the car. Rinehart located the car at a Wal-Mart parking lot. When Johnson reached the lot, he saw a green Plymouth driving out at a high speed pursued by Rinehart. Johnson activated his siren and the red lights on top of his car and followed Rinehart. The green Plymouth went south to U.S. Route 50 and headed east. During the chase, the three cars drove at speeds up to 100 miles per hour.

At one point during the chase, Johnson saw the driver of the green Plymouth stick a rifle out his car window. The wind, however, kept catching it until the driver pulled it back inside the car.

At about three-quarters of a mile west of Illinois Route 130, the Richland County deputies set up a roadblock. The driver of the Plymouth swerved through the roadblock and stopped approximately 200 feet down the road. Apparently one of the deputies' shots severed the battery cable on the car, thereby disabling it. The driver, defendant, stepped out of the green Plymouth with a pistol, a rifle, and a red object in his hands. Johnson and Rinehart, who had stopped next to defendant's car, ordered defendant to place the weapons back in his

car. After about 15 seconds of looking back and forth from Rinehart to Johnson, defendant put the weapons on the seat of his car and went over to the curb and sat down. On his way to jail, defendant stated, "It is a shame a man has to make a living with a gun, but the law makes me do it."

Rinehart testified when he found the green Plymouth in the Wal-Mart parking lot, he pulled in front of it, opened his car door, partially stepped out and said to the driver, "Sir, I need to talk to you." The driver, dressed in a blue or green shirt and wearing a cap, did not answer. Instead the driver started his car, backed up and drove out of the lot. Rinehart followed in his car. By the time the cars reached U.S. 50, Rinehart had activated his siren, alternating headlights and alternating red lights in the grille.

About 1½ miles west of Clay City, Rinehart saw the driver point a silver-colored automatic pistol out the window at him. Rinehart was then 50 to 75 feet behind the Plymouth. He heard three shots. Further down the road, the driver fired two more shots at Rinehart. The driver then stuck a rifle out the car window, but was unable to control it because of the high speed. After the chase had ended, Rinehart inspected his car and found a perfectly round indentation with the paint chipped away above one of the headlights. Rinehart also testified that during the chase, an object struck his windshield which had a greater velocity and more of a "dead" sound than a rock striking a windshield.

Defendant testified at trial on his own behalf and painted a very different picture of the incident. According to defendant, during 1979 and 1980, he tried to help the Salem police apprehend a drug pusher. The pusher turned out to be a psychiatrist who could not be arrested because he was authorized to write prescriptions. The psychiatrist let defendant know he was aware that defendant had turned him in and began to watch him. In March of 1984, the psychiatrist no longer came to defendant's neighborhood. Defendant became apprehensive because he realized that if he were to be harmed, it would occur after the psychiatrist left town. Defendant believed the psychiatrist might be connected to the Mafia.

On June 13, defendant decided to go to Wal-Mart to buy a shirt. On the way, he stopped to check his laundry in the trunk of the car. As he was looking through his laundry, he spilled some oil from a can onto his bumper. He was wiping off the bumper when Johnson drove by. Defendant then proceeded on to the store.

Upon returning to the parking lot from inside Wal-Mart, defendant noticed a car stop in front of his. Because of a glare on his wind-

shield, defendant could not see the car very well. He thought he saw, however, a man slumped over the steering wheel, fumbling with something on the floor. He also noticed the driver's door open about one inch. Defendant realized he did not know this man who called out to him. According to defendant, the word "dope" screamed in his mind and he decided he had to get out of the lot. Defendant knew he was being chased, but did not see any emergency lights or hear any sirens. He thought the man in the car was going to shoot him. Defendant began shooting at the car, trying to hit the car's radiator to make it stop. He also tried to use a rifle, but was unable to control it. At this point, defendant noticed a second car, which to him appeared to be a station wagon with luggage racks on top, chasing him. As defendant approached Olney, Illinois, he saw a line of cars ahead of him. Defendant believed an accident had occurred although he saw no police cars or uniforms as he went around the scene. Defendant decided to stop to see if he could be of assistance when he heard gunfire. His car went dead and coasted to a stop. Defendant got out of the car and found two officers with drawn weapons facing him. He was stunned and could not tell what they were saying. He finally walked away from the car. On the way to jail, defendant stated that it was a shame a man had to pick up a gun to save his living, meaning his life. Defendant claimed that he was acting in self-defense and had no intent to kill any police officers. The jury, however, found him guilty of attempted murder.

Defendant first argues on appeal that the trial court erred in finding him fit to stand trial without holding a complete adversarial fitness hearing, especially in view of his intention to represent himself. Defendant, however, has misperceived the proceedings.

■ Prior to trial, defense counsel petitioned for a fitness hearing, stating he was having problems discussing the case with defendant because of defendant's tendency to wander from topic to topic. By statute (see Ill. Rev. Stat. 1985, ch. 38, par. 104—11), once a *bona fide* doubt concerning a defendant's fitness is raised, that defendant is entitled to a fitness hearing at which the State has the burden of proving that the defendant is fit to stand trial by a preponderance of the evidence. (See, *e.g.*, *People v. Johnson* (1984), 121 Ill. App. 3d 859, 861, 460 N.E.2d 336, 338; *People v. Turner* (1982), 111 Ill. App. 3d 358, 361, 443 N.E.2d 1167, 1171.) The trial court found a *bona fide* doubt and ordered a hearing. Because one of the examining doctors was moving from the area, a partial fitness hearing was held in October. This doctor testified that based upon his evaluation of defendant and upon the reports of the psychologists working under him, defend-

ant was not fit to stand trial. Although he believed defendant was an exceptionally brilliant individual, he also felt that defendant exhibited a "pretty significant veer in his thinking." The doctor further stated that defendant had dedicated his life to the study of alien mind control and that defendant believed that the series of events leading to the pending criminal charges against him occurred because he had taken flight on the day the aliens were going to remove him from the planet. Defendant also claimed to be the only person alive in his lineup and viewed the procedure as another instance of how his future had been determined by alien beings. The doctor concluded defendant was almost a "genuine, pure paranoid personality."

Defendant was also examined by another doctor. His psychiatric evaluation, as stipulated to at the continued fitness hearing, indicated that even though defendant was preoccupied with UFOs, there were "many islands of reality" within his thinking. The doctor therefore found defendant fit to stand trial. Before counsel made arguments concerning defendant's fitness, defendant informed the court that he would be representing himself because defendant did not want evidence of his mental state interjected at trial. Defendant further stated defense counsel was not highly experienced in criminal law and his inexperience would prevent him from giving "100% effort" to the case. The trial court found defendant fit to stand trial and scheduled another hearing on defendant's desire to represent himself.

Defendant now asserts on appeal that he was denied an adversarial fitness hearing. We disagree. The court conducted two days of hearings on the very question of defendant's fitness to stand trial. The court heard the testimony of one psychologist and accepted the reports of three psychologists and one psychiatrist. At the close of all the evidence, the trial court asked defense counsel if he had anymore evidence to offer on this issue. Counsel responded in the negative. The court then gave defendant the opportunity to make his own statement. Defendant availed himself of this opportunity and proceeded to discuss his desire to represent himself. The record clearly reveals defendant was not denied an adversarial fitness hearing. The trial court offered defendant every opportunity to present all of his evidence. Merely because defense counsel did not make a closing argument, especially when none was required or requested, does not mean an adversarial fitness hearing did not take place. We find no error in this instance.

We also find the trial court's determination that defendant was fit to stand trial is not against the manifest weight of the evidence. Fitness involves only the accused's ability to function within

the context of legal proceedings, in other words, the ability to understand the nature and purpose of the proceedings against him or to assist in his defense. (See *People v. Kessler* (1983), 113 Ill. App. 3d 354, 357, 447 N.E.2d 495, 497; *People v. Jones* (1982), 109 Ill. App. 3d 120, 128, 440 N.E.2d 261, 267.) The fact that a defendant has a history of mental problems or requires psychiatric treatment does not mean he necessarily is unfit to stand trial. (*Kessler*, 113 Ill. App. 3d at 357, 447 N.E.2d at 498; *Turner*, 111 Ill. App. 3d at 367, 443 N.E.2d at 1175. See also *People v. Newbern* (1974), 18 Ill. App. 3d 532, 537-38, 310 N.E.2d 42, 46-47.) Quite clearly, defendant was fit to stand trial (as later evidenced by his conduct at trial) even though he has an unusual preoccupation with aliens and UFOs. The trial court had before it the testimony of and several reports from qualified mental health professionals. Each one revealed defendant had some ability to understand the trial proceedings and to assist counsel in his defense. Even so, the court was not required to accept the opinions of the expert witnesses. (See *Jones*, 109 Ill. App. 3d at 126, 440 N.E.2d at 265; *People v. Williams* (1980), 87 Ill. App. 3d 860, 864, 409 N.E.2d 439, 441.) The court also had its own observations on which to rely. (See *Turner*, 111 Ill. App. 3d at 367, 443 N.E.2d at 1175.) We see no reason to overturn a determination based on competent evidence in this instance. We simply find no abuse of the trial court's discretion, and we will not substitute our judgment for that of the trial court, which observed both the proceedings and defendant. See *People v. Branson* (1984), 131 Ill. App. 3d 280, 289-90, 475 N.E.2d 905, 912-13; *Turner*, 111 Ill. App. 3d at 366, 443 N.E.2d at 1174; *Jones*, 109 Ill. App. 3d at 126, 130, 440 N.E.2d at 265, 268.

■ Defendant further contends the trial court erred in allowing him to waive counsel and represent himself when his ability to think rationally was in doubt. Defendant, however, did not waive counsel and proceed *pro se*. Defendant conducted his own defense but with the assistance of a court-appointed attorney. Under such circumstances, defendant did not waive counsel. (See *People v. Hite* (1983), 115 Ill. App. 3d 66, 69, 450 N.E.2d 416, 418; *People v. Lindsey* (1974), 17 Ill. App. 3d 137, 141, 308 N.E.2d 111, 115.) Moreover, the trial court detailed the difficulties, problems and disadvantages of *pro se* representation. The court also informed defendant of the possible penalties he faced and discussed the seriousness of the charge with him. Any waiver therefore was knowingly and intelligently made. The trial court committed no error in allowing defendant to proceed with his own defense with stand-by counsel assisting him once it had made the determination defendant was fit to stand trial. See *People v. Siler*

(1987), 154 Ill. App. 3d 102, 108, 506 N.E.2d 756, 760; *Kessler*, 113 Ill. App. 3d at 359-62, 447 N.E.2d at 499-501.

Defendant also argues the trial court erroneously admitted into evidence statements made after he had exercised his right to cut off interrogation. Upon being arrested, defendant was taken to the police station. One of the officers read defendant his *Miranda* rights. Defendant stated he understood his rights but would not sign anything because he previously had been physically abused and manipulated by another police department. Defendant did not ask for an attorney or assert his right to terminate questioning, however. Defendant continued to talk with the officer and eventually stated that if he had gotten out of his car earlier he would have killed the officers pursuing him. The State used defendant's statement to help establish his intent to kill. Defendant contends by refusing to sign anything, no valid waiver of his rights occurred. Therefore, according to defendant, his comments should have been suppressed.

██ █ Voluntariness of a confession or other incriminating statements need only be proved by a preponderance of the evidence. (*People v. Gorham* (1978), 66 Ill. App. 3d 320, 325, 384 N.E.2d 6, 10.) An express formalistic waiver of one's *Miranda* rights is not required. Any clear manifestation of a desire to waive these rights is sufficient. (*People v. Higgins* (1972), 50 Ill. 2d 221, 227, 278 N.E.2d 68, 71, *cert. denied* (1972), 409 U.S. 855, 34 L. Ed. 2d 100, 93 S. Ct. 195.) Consequently, when an individual is informed of his rights and indicates he understands them and then continues to discuss the matter with the police, he has waived his right to remain silent. He has not manifested a desire to terminate questioning, and no denial of his rights has occurred simply because the questioning continues. (See *Gorham*, 66 Ill. App. 3d at 325, 384 N.E.2d at 10; *People v. Fultz* (1975), 32 Ill. App. 3d 317, 338-39, 336 N.E.2d 288, 305-06.) The trial court therefore properly denied defendant's objections to the admission of his statements in this instance.

The defendant next contends the trial court committed plain error by erroneously instructing the jury on the offense of attempted murder. The court in giving the definitional murder instruction included the language "intends to *** do great bodily harm." Defendant correctly points out that attempted murder requires the specific intent to kill. (See *People v. Trinkle* (1977), 68 Ill. 2d 198, 369 N.E.2d 888.) Because the instruction here permitted the jury to convict defendant even if it only found he intended to cause great bodily harm, defendant believes reversal is required.

██ As noted, defendant did not object to these instructions at

trial nor did he raise the issue in his post-trial motion. Generally, failure to do either waives the issue for appeal unless the interests of justice require otherwise. (See, *e.g., People v. Roberts* (1979), 75 Ill. 2d 1, 10-14, 387 N.E.2d 331, 335-37.) Here the interests of justice do not require otherwise, for the evidence of defendant's guilt is overwhelming.

Intent is a state of mind, which if not admitted, can only be shown by surrounding circumstances. (*People v. Anderson* (1982), 108 Ill. App. 3d 563, 566, 439 N.E.2d 65, 68.) The very fact of firing a gun at a person supports the conclusion that the individual doing so acted within the intent to kill. (108 Ill. App. 3d at 567, 439 N.E.2d at 69; *People v. Seats* (1979), 68 Ill. App. 3d 889, 895, 386 N.E.2d 879, 884.) At trial, defendant not only admitted to but described in some detail the firing of seven or eight shots at Rinehart. He aimed by lining up the sights of his gun in his rearview mirror while driving at speeds in excess of 100 miles per hour. At one point, defendant tried to use a rifle, but because of his speed and the resulting velocity, he reloaded his pistol and began shooting again. When questioned about the incident, defendant responded he would have killed the officers pursuing him if he could have gotten out of his disabled car earlier. Any error in the definitional instruction of murder was harmless. *People v. Jones* (1979), 81 Ill. 2d 1, 9-10, 405 N.E.2d 343, 346-47; *Roberts,* 75 Ill. 2d at 14-15, 387 N.E.2d at 337-38; *Anderson,* 108 Ill. App. 3d at 567-68, 439 N.E.2d at 69; *Seats,* 68 Ill. App. 3d at 894-96, 386 N.E.2d at 883-84. *Cf. People v. Harris* (1978), 72 Ill. 2d 16, 28, 377 N.E.2d 28, 33-34; *People v. McDaniel* (1984), 125 Ill. App. 3d 694, 700-01, 466 N.E.2d 662, 667. See also *People v. Cox* (1979), 71 Ill. App. 3d 695, 697, 390 N.E.2d 540, 541-42 (error not waived).

As one of many points in his *pro se* brief, defendant argues he attempted to shoot Rinehart because he thought Rinehart was a drug dealer trying to kill him. Defendant believes the "defense of necessity" justifies his actions. The defense of necessity applies, however, where an accused reasonably believed that conduct which would otherwise be an offense was necessary to avoid an injury greater than the one which reasonably might have resulted from his own conduct. (See *People v. Krizka* (1980), 92 Ill. App. 3d 288, 289-90, 416 N.E.2d 36, 37.) Defendant cannot so establish. Although the officers chased him at high speeds, neither threatened defendant nor displayed his sidearm in a threatening manner. Rinehart was wearing his uniform when he first approached defendant, and his car was marked. Upon pursuing defendant, both officers had their sirens on and their lights flashing. Moreover, defendant never attempted to

show he was fleeing to a position of safety, such as a police station. Based on the record before us, defendant simply cannot prevail on this issue.

Defendant's asserts as his final point on appeal that his sentence is excessive. He believes the court failed to give adequate consideration to this rehabilitative potential. We disagree.

■■ ■ As our courts have repeatedly held, the imposition of a sentence is a matter of judicial discretion and, absent an abuse of that discretion, we will not alter any sentence upon review. (*E.g.*, *People v. Perruquet* (1977), 68 Ill. 2d 149, 153, 368 N.E.2d 882, 883.) The weight to be accorded the various factors in aggravation and mitigation depends upon the circumstances of each case. (*E.g.*, *People v. Piontkowski* (1979), 77 Ill. App. 3d 994, 996, 397 N.E.2d 36, 38.) Here the circumstances support the trial court's determination. Although occurring late in his life, defendant had turned to a life of crime. He has exhibited violent behavior, even toward his parents and neighbors, and generally has become a serious threat to society. And, as his psychologist testified, there is no treatment for defendant. The record clearly reveals a lack of rehabilitative potential. We find no abuse of the trial court's discretion in this instance. See *People v. Heflin* (1978), 71 Ill. 2d 525, 545-46, 376 N.E.2d 1367, 1376-77, *cert. denied* (1979), 439 U.S. 1074, 59 L. Ed. 2d 41, 99 S. Ct. 848; *Perruquet*, 68 Ill. 2d at 154, 368 N.E.2d at 884.

Finally, we note in answer to another of defendant's *pro se* contentions that any alleged inaccuracies in the record on appeal are harmless and certainly do not justify reversal of defendant's conviction.

For the aforementioned reasons, we affirm the judgment of the circuit court of Richland County convicting defendant of attempted murder.

Affirmed.

WELCH and LEWIS, JJ., concur.