Willie ADAMS, Jr., Appellant,

v.

STATE of Alaska, Appellee.

No. A-3212.

Court of Appeals of Alaska.

April 10, 1992.

Willie Adams, Jr., pro se.

Thomas J. Meyer, Asst. Public Defender, Juneau, and John B. Salemi, Public Defender, Anchorage, for appellant.

Cynthia M. Hora, Asst. Atty. Gen., Office of Special Prosecutions and Appeals, Anchorage, and Charles E. Cole, Atty. Gen., Juneau, for appellee.

Before BRYNER, C.J., COATS, J., and ANDREWS, Superior Court Judge.*

## OPINION

COATS, Judge.

Willie Adams, Jr., was convicted, following a jury trial, of assault in the second degree, a class B felony. AS 11.41.210. Superior Court Judge Rodger W. Pegues sentenced Adams to ten years with three years suspended. He also ordered Adams to serve three years on probation following his release from incarceration. Adams appeals, raising several issues. We reverse Adams' conviction.

Adams' main contention on appeal is that Judge Pegues erred in allowing Adams to waive counsel and to conduct his own defense at trial. A certain amount of factual background is necessary for us to discuss this contention.

Michael Todd testified that just before midnight on December 11, 1987, he was attacked by Adams on South Franklin Street in Juneau. According to Todd, Adams, whom Todd knew as an acquaintance, threw him up against a wall, saying that he was "tired of you white motherfuckers fucking with me." Todd testified that Adams then pulled a gun and fired two shots, one of which grazed Todd's back.

Todd testified that Adams then started waving the gun, giving Todd the opportunity to grab Adams' gun hand. During the struggle, Adams bit Todd's hand. Todd and Adams then had a discussion in which,

according to Todd, he tried to talk Adams out of killing him by telling him about his black army friends in Vietnam. Thereafter, Todd stated, Adams was "talking with me and getting real chummy. So when he turned [me] loose ... I just took off ... down the street to the police department."

A short time later, the police found Adams and arrested him. While resisting efforts to be handcuffed, Adams reportedly stated, "You don't know what you're doing, I'm bad, you're messing with the wrong guy, I'm going to blow your fucking head off...." When police patted Adams down, they found a small handgun and two cartridge clips inside Adams' coat pocket. Near the scene of the shooting, police recovered a live round and two spent rounds of ammunition. Adams' blood alcohol level after arrest was .212% by blood and .336% by urine.

The court appointed the Public Defender Agency to represent Adams on December 19, 1987. According to Adams' brief on appeal, Adams first asked the court to be allowed to represent himself at a preliminary hearing on December 22, 1987. According to the record, the issue of whether Adams could represent himself came before the court on March 23, 1988, at a pretrial hearing before Judge Pegues. At that hearing, the assistant public defender who was representing Adams stated that Adams wanted to represent himself with the assistance of consultative counsel. The public defender informed the court that Adams had represented himself in prior trials, including one before Judge Pegues in 1986. Judge Pegues indicated that he remembered the trial.

At the state's request, Judge Pegues made inquiries of Adams to determine whether Adams was able to waive counsel and wanted to waive counsel under *McCracken v. State*, 518 P.2d 85 (Alaska 1974). While Judge Pegues was questioning Adams, Adams started to explain how President Reagan was personally involved in his case. After listening to Adams,

---

* Sitting by assignment made pursuant to article IV, section 16 of the Alaska Constitution.

Judge Pegues concluded that what Adams was saying was incredible. Judge Pegues stated that Adams was exhibiting symptoms consistent with hallucinations and delusions. The public defender contended that Adams should be allowed to represent himself no matter how irrational his defense. The state expressed concerns whether Adams was able to knowingly and intelligently waive counsel or to present his defense in a rational and coherent manner. The parties ultimately agreed to have Dr. Robert W. Rowland, a psychologist, perform a mental health examination on Adams.

Dr. Rowland examined Adams and filed a report with the court. Dr. Rowland wrote:

Mr. Adams is attempting to defend himself in this action because, according to him, his attorney did not believe his account of the incident.... Mr. Adams contends he had contacted the Federal Bureau of Investigation after he had been shaken down and robbed by the Juneau Police Department who he feels masquerade as State Troopers. He believes that the Federal Bureau of Investigation has investigated the Juneau Police Department but is now failing to come forward. Mr. Adams has contacted the F.B.I., the President of the United States, the joint chiefs of staff and various ambassadors in order to either have them serve as character witnesses for him or to press his case about the "shakedown"....

....

Mr. Adams has a previous arrest.... Mr. Adams defended himself against that charge....

... Mr. Adams [is] presented as a [sic] educated, cooperative black male.... Mr. Adams is fully oriented, alert, his affect appears somewhat blunted, but not inappropriate.

....

Diagnostic impression—delusional (paranoid) disorder

....

While Mr. Adams appears to have an active delusional disorder, he may be adequately compensated to be held responsible for the charges against him. Due to the delusional process, however, Mr. Adams may have difficulty acting in his own defense and will very likely come to believe that if he is found guilty, it is due to a conspiracy which will come to include the primary players in the legal process. A Forensic evaluation at this time may be in Mr. Adams' best interest.

A status hearing was held on March 25, 1988. At this hearing Dr. Rowland stated that he was not particularly expert in the test for competency to represent oneself. However, Dr. Rowland verified that, although Adams appeared to meet the standard for competency to stand trial, because of his delusions, Adams probably was not competent to waive counsel.

On March 29, 1988, Judge Pegues ordered Adams' commitment for a forensic evaluation to determine his competency to waive counsel and represent himself. Judge Pegues specifically asked the report to address, first, whether "Adams is capable of presenting his allegations in a rational and coherent manner," and, second, whether "Adams understands *precisely* what he is giving up by not having an attorney represent him at trial." (Emphasis in original).

Dr. David J. Sperbeck, a clinical psychologist with the Alaska Department of Health and Social Services, sent the court the results of Adams' forensic exam on May 9, 1988. Dr. Sperbeck reported:

Mr. Adams is clearly alert and oriented in all spheres. He is a healthy, well-groomed, 33–year–old, single black male, who demonstrated no disturbance of affect or mood whatsoever.... Hallucinations were denied and were absent. He has an incapsulated, and apparently delusional, belief in a conspiracy by the Juneau Police Department to fabricate evidence against him in the instant offense. He believes that this is an ongoing conspiracy.... He functions in the bright-normal range of intelligence....

....

... I do not know ... the circumstances surrounding Mr. Adams' prior

contacts with the Juneau Police Department ... [, but] [r]egardless of these actual circumstances, the subject's thinking in regard to his relationship with the Juneau Police Department approaches delusional proportions. For instance, he has apparently gone so far as to invite the F.B.I. and various political appointees, including the President of the United States, to serve as character witnesses for him, and to assist him.... This type of disordered thinking may be clinically described as a systematized delusion since it involves ... a single delusion (i.e., Mr. Adams' belief that he has been singled out for persecution) with multiple elaborations that are related by the individual to the original theme. This is classified as a delusional (paranoid) disorder....

. . . .

It is, therefore, my opinion that Mr. Adams is competent to stand trial, and competent to waive counsel and defend himself since he has sufficient present ability to consult with his attorney for advice with a reasonable degree of rational understanding, and that he has a rational as well as a factual understanding of the *proceedings,* if not the evidence, against him.

(Emphasis in original.)

Judge Pegues held a hearing on May 18, 1988, on the issue of Adams' competence to represent himself. Judge Pegues spoke with Adams to determine if he understood the benefits of counsel and the disadvantages of representing himself. He tried to talk Adams out of his decision. Even though he felt that Adams was delusional, Judge Pegues ruled: "I'm satisfied that you are insistent on proceeding and you understand what you're giving up, and the mental health professional says that you

are qualified to do this and competent to make this choice so I have to abide by it." The judge expressed personal concerns of whether Adams was competent, but stated that he felt constrained to follow the recommendation of Dr. Sperbeck.[1]

As *pro se* counsel, Adams proceeded to file various motions with the court. These motions requested often bizarre court action, such as that "this honorable court ... pay attention to itself" and that a federal arrest warrant be issued for a Greg Love to "prove that the State has been made a fool of on more than one occasion, the Courts have been contempted, making a mockery of justice and the American system of Juris Prudence [sic]." In a motion dated April 29, 1988, Adams requested contempt charges be brought against:

> the STATE OF ALASKA ... [because] [t]he STATE is aware the defendant ... does not have the time necessary to recall items irrelavant [sic] to his own well being ... [a]nd to do so, anything said cand [sic] be incoherent because the defendant-witness cannot address the issue because of the emotional and mental stress created in conjunction to his own well being.

In addition to requesting extradition of a Mexican national and subpoenas for the Director of the F.B.I. and a South American nun, Adams petitioned the United States Supreme Court to intervene, calling the trial court corrupt and racist and noting that "[t]his will prove embarassing [sic] to president Ronald Reagan, who was notified ... and yet did not send the Army troops here as he did to Panama."

Adams was tried before a jury in July 1988. Adams, with advisory counsel, conducted his own defense, claiming he was the victim of a police conspiracy to frame

---

**1.** Judge Pegues made the following statements on the record to Adams:

> I'm satisfied that you are insistent on proceeding and you understand what you're giving up, and the *mental health professional says that you are qualified to do this and competent to make this choice so I have to abide by it.* I think you're making a grave mistake.
>
> . . . .

> I'm telling you your story is not credible. You simply come across as a person who is a) lying, or b) delusional, or c) both.
>
> . . . .
>
> ... [T]he problem with this mental health examination is I don't think they take your insanity seriously.... I'm really worried that you are more delusional than the mental health professional thinks. But he's the mental health professional, and I'm not.

him. The jury found Adams guilty of second-degree assault. Adams also represented himself, with advisory counsel, at sentencing.

Following his conviction and sentencing, Adams filed motions that continued to allege a conspiracy to falsely convict him. Upon receiving these motions, Judge Pegues noted that these motions were "not intelligible" and obscene, and ordered the public defender to take over as lead counsel because Adams was no longer able to follow the rules of court.

The public defender then filed a postconviction relief motion in which he alleged that Adams was "too delusional to represent himself." The court conducted an evidentiary hearing at which Dr. Sperbeck amplified on his May 1988 report. Dr. Sperbeck testified that, in May of 1988, Adams was suffering from "psychosis," "a major mental illness"—"delusional (paranoid) disorder." Dr. Sperbeck concluded that Adams was competent to represent himself because Adams knew how trial procedures worked and was capable of conforming his behavior to court rules. However, he stated that while Adams could rationally present his case, Adams was "delusional with respect to ... the facts."

Judge Pegues ultimately denied Adams' motion, finding that Adams had presented his case in a rational manner and had been intimately familiar with almost all the evidence.

■ In general, a defendant in a criminal case has the right to waive counsel and represent himself. *Faretta v. California,* 422 U.S. 806, 821, 95 S.Ct. 2525, 2534, 45 L.Ed.2d 562 (1975); *McCracken v. State,* 518 P.2d 85, 91 (Alaska 1974). In *McCracken,* our supreme court stated:

> Having concluded then that there is a right to self-representation under our own constitution, we must illuminate the contours of that right. The right is not absolute. In order to prevent a perversion of the judicial process, the trial judge should first ascertain whether a prisoner is capable of presenting his allegations in a rational and coherent manner before allowing him to proceed *pro se.*

*Id.* The case before us raises the issue of what sort of minimum capability is necessary before the court may allow a defendant to conduct his own defense. In *Faretta,* the Supreme Court stated that a defendant desiring self-representation does not need to "have the skill and experience of a lawyer in order competently and intelligently to choose self-representation." 422 U.S. at 835, 95 S.Ct. at 2541. From *Faretta* and *McCracken,* it seems clear that the average criminal defendant must be allowed self-representation if the trial court makes a careful inquiry in which the court determines that the defendant understands his right to counsel, is determined to forego that right, and can conduct his defense without being unusually disruptive. *See Burks v. State,* 748 P.2d 1178, 1180–82 (Alaska App.1988); *Burks,* 748 P.2d at 1183 (Coats, J., dissenting).

As a starting point, the record establishes that Adams was suffering from a significant mental illness that manifested itself in paranoid delusions. These paranoid delusions were inextricably intertwined with Adams' view of the case and his ability to understand the evidence against him. The two psychologists who examined Adams advanced this diagnosis. Furthermore, Judge Pegues appears to have accepted this diagnosis. Dr. Rowland found that Adams was delusional and concluded that, given the delusions, Adams was probably not competent to waive counsel. Dr. Sperbeck also found that Adams suffered from a major mental illness—delusional (paranoid) disorder. It seems clear from Dr. Sperbeck's testimony that he concluded that Adams' view of the case was dominated by his paranoid delusions. Although Dr. Sperbeck concluded that Adams was capable of representing himself, this opinion seemed to be based on his assumption that Adams had a right to present his own defense, no matter how unreasonable or delusional the defense was, as long as he was able to understand the court proceedings and cooperate with his attorney. Judge Pegues appears to have concluded that Adams suffered from paranoid delu-

sions but apparently deferred to Dr. Sperbeck's conclusion that Adams was capable of defending himself. Adams' statements and motions also established that his entire perception of the case was governed by his paranoid delusions.

██ We believe that a defendant is not capable of representing himself at trial when the defendant is suffering from severe paranoid delusions inextricably intertwined with his ability to analyze the facts of the case. In reaching this conclusion, we rely particularly on *McCracken* and *Else v. State*, 555 P.2d 1210, 1211–12 (Alaska 1976), which our supreme court decided two years after *McCracken* and after the United States Supreme Court decided *Faretta.*

In *McCracken* the court stated, "In order to prevent a perversion of the judicial process, the trial judge should first ascertain whether a prisoner is capable of presenting his allegations in a rational and coherent manner before allowing him to proceed *pro se.*" 518 P.2d at 91. In *Else*, the defendant had waived counsel and entered a guilty plea without counsel. Else later moved to withdraw the plea, arguing that he had entered the plea without counsel. In determining that the defendant had knowingly and intelligently waived his right to counsel, the supreme court emphasized that the trial judge had read a recent psychiatric report stating that Else's "thought content seemed adequately organized with no evidence of delusions or other psychotic indicators." 555 P.2d at 1212. The supreme court added that "Else's responses to the trial court's questions were rational and showed no confusion. There was nothing in the record which suggested that Else was incapable of presenting his allegations rationally and coherently." *Id.* From the discussion in *McCracken* and *Else*, we conclude that defendants who suffer from paranoid delusions which clearly affect their ability to perceive the evidence against them are not in a position to represent themselves.

We also find support for our position in the case of *People v. Burnett*, 188 Cal. App.3d 1314, 234 Cal.Rptr. 67 (1987). In

that case the court concluded that the trial court did not have sufficient psychiatric information to allow the defendant to waive his right to an attorney. The court stated:

> Realization of the risk of self-representation necessarily involves an element of sober self-examination. A defendant who does not appreciate the extent of his own disability cannot be fully aware of the risk of self-representation where the disability significantly impairs his capacity to function in a courtroom.

*Id.*, 234 Cal.Rptr. at 75.

██ We conclude that the record establishes that Adams did not possess the requisite minimum capability to conduct his own defense because his paranoid delusions affected his perception of the evidence and fettered any ability to appreciate the extent of his own disability. Adams was unable either to be fully aware of the risk of self-representation or to rationally conceive and coherently present a defense. In reaching this decision, we are aware that trial courts face difficult decisions in determining that a defendant is unable to waive his right to counsel. *Faretta* and *McCracken* make it clear that the average defendant is capable of making such a waiver. A defendant can be deprived of the right to represent himself only in the fairly rare circumstances in which the defendant is unable to present a rational and coherent defense. However, in this case, Adams did not meet that standard of minimal capability.

The conviction is REVERSED.

BRYNER, C.J., concurs.

MANNHEIMER, J., not participating.

BRYNER, Chief Judge, concurring.

I join in the court's opinion, which, as I understand it, stands for the limited proposition that a person suffering from paranoid schizophrenia cannot be permitted to waive counsel when the person's delusional system encompasses defense counsel and thus influences the decision to proceed *pro se.* This proposition finds support in the case law. *See, e.g., People v. Burnett*, 188 Cal.App.3d 1314, 234 Cal.Rptr. 67 (1987);

*State v. Bauer*, 245 N.W.2d 848 (Minn. 1976).[2]

Our decision should not be read to suggest that the standard for determining competency to waive procedural rights such as the right to counsel differs from the general standard for determining competency to proceed. The Alaska Supreme Court has expressly disavowed the existence of such a dual standard. *See Dolchok v. State*, 639 P.2d 277, 293 (Alaska 1982).

In the present case, the psychological evaluation suggested that Adams was mentally competent to proceed and to waive counsel. Judge Pegues relied on this psychological evaluation to find that Adams had voluntarily waived his right to counsel. Adams has not alleged that he was incompetent to proceed with trial—that is, that he was unable to assist in his own defense. This court's opinion, while finding that Adams did not properly waive counsel, has not questioned his competency to stand trial. Given a single standard for determining competency to proceed and competency to waive procedural rights, the fact that Adams' competency to proceed remains unchallenged may seem inconsistent with our conclusion that the trial court erred in finding a valid waiver of counsel. However, the inconsistency is apparent, not real.

The issue of competency is necessarily abstract, requiring a determination of an individual's theoretical capacity to make informed and intelligent choices. The psychological evaluation in Adams' case addressed competency in this abstract sense, indicating that Adams had the mental capacity to assist in his own defense and was capable of knowingly and intelligently waiving counsel.

While competency, in this abstract sense, is a necessary component of a valid waiver of counsel, it is not in and of itself sufficient. Before finding a knowing and intelligent waiver of counsel, a court must determine not only that the accused is capable of waiving the right to counsel, but also that he has in fact entered into a knowing and voluntary waiver of that right. In the present case, upon determining that Adams was mentally capable of making a knowing and intelligent decision as to counsel, it was incumbent on the court to go further and determine whether his decision to represent himself actually was knowingly and intelligently made. To the extent Adams' mental illness affected his decision to waive, the court was required to consider that fact, just as it was required to consider Adams' mental illness in deciding the broader question of general competency. Instead of separately determining the issues of competency and actual waiver, however, the trial court merged these issues into a single determination of competency.

Our decision reversing the trial court is based not on the conclusion that Adams was mentally incompetent to waive counsel, but rather on our finding that Adams did not actually make a knowing and intelligent waiver in this case, since his decision to waive counsel was affected by his mental illness. A review of the record leaves little doubt that Adams' refusal to accept representation in this case was the product of his distorted perception that counsel was among those conspiring against him.

It is noteworthy, moreover, that, in addressing the issue of competency to waive counsel, the trial court essentially deferred to the professional judgment of Dr. David J. Sperbeck, the examining psychologist. In relevant part, Judge Pegues stated:

> [T]he mental health professional says that you are qualified to do this and competent to make this choice *so I have to abide by it.*

(Emphasis added.) The determination of competency, however, is ultimately a legal matter for determination by the court, not a medical matter for determination by an expert witness. In my view, the superior

**2.** The state cites several decisions for the proposition that other courts have allowed paranoid-schizophrenics to waive counsel and proceed *pro se.* None of the state's cases, however, involves a situation in which the defendant's decision to waive counsel was the product of the mental illness. *See, e.g., People v. Wright,* 171 Ill.App.3d 573, 121 Ill.Dec. 858, 525 N.E.2d 1165 (1988); *State v. Hahn,* 106 Wash.2d 885, 726 P.2d 25 (1986); *State v. Evans,* 125 Ariz. 401, 610 P.2d 35 (1980).

court's deference to Dr. Sperbeck's opinion amounted to a failure to exercise judicial discretion and, as such, would independently require reversal. *See, e.g., Cano v. Anchorage*, 627 P.2d 660, 663 (Alaska App. 1981).

I find two other aspects of this case sufficiently troubling to deserve mention, even though neither has captured the attention of the parties on appeal. First, it does not appear that Adams ever received an adequate psychiatric evaluation for purposes of determining his competency to proceed or to waive counsel. After a preliminary examination of Adams by Department of Corrections psychologist Robert Roland yielded inconclusive results, Judge Pegues referred Adams to the Alaska Psychiatric Institute for a psychiatric evaluation in accordance with AS 12.47.100. Adams was evaluated by Dr. Sperbeck, another psychologist. However, AS 12.47.100 expressly requires an evaluation by a "qualified psychiatrist," not by a psychologist. The two disciplines are not interchangeable, and the failure to comply with the statutory mandate in this case could, in my view, be deemed plain error.[3]

Second, I am concerned that the Alaska Public Defender Agency's representation of Adams in moving for a new trial may have violated the agency's duty to avoid representation of conflicting interests. Prior to trial, the assistant public defender representing Adams took the active and affirmative position that the superior court should accept Adams' waiver of counsel as knowingly and intelligently entered. Counsel prevailed in convincing the court of this view. At the conclusion of trial, however, the same attorney moved for a new trial, advancing an argument diametrically opposed to the view he had previously (and successfully) urged upon the court.

It is difficult for me to understand how Adams' trial counsel could have maintained any semblance of credibility with the trial court in advocating a position that was in open conflict with the position that he had actively and successfully advocated before the jury reached its verdict. I thus question whether Adams' trial counsel was capable of effectively representing Adams' interest in moving for a new trial. Given our decision to reverse on the waiver issue, it is unnecessary to resolve the conflict issue. However, I have strong reservations concerning the propriety of the public defender agency's continued representation of Adams under these circumstances.

---

**3.** The broad language of Alaska's guilty but mentally ill statute, AS 12.47.070, might also be read as authorizing competency determinations. That statute would permit the determination to be based on an examination by "at least two qualified psychiatrists or two forensic psychologists certified by the American Board of Forensic Psychology." Adams' evaluation was no more proper under this provision than it was under AS 12.47.100. Although Adams was seen by two psychologists, the record establishes that only Dr. Sperbeck was a board certified forensic psychologist. Dr. Roland was not, and, in fact, expressed a lack of familiarity with the applicable competency standard.